John W. EHRLER et al., Appellants,

v.

KELLWOOD COMPANY, a corporation, and Jerome H. Klenke, Appellees.

No. 75–1075.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1975.

Decided Sept. 3, 1975.

Merle L. Silverstein, Clayton, Mo., for appellants.

Donald W. Bird, St. Louis, Mo., for appellees.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and HEANEY, Circuit Judges.

LAY, Circuit Judge.

This is an appeal from a judgment in favor of the defendants in an action brought under § 10 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs John W. Ehrler, Leonard A. Knobbe, William B. Shelley, Jr., John E. Maurer and Edward J. Powers, Jr. were five of the original eight shareholders in the Aquarius Plastics Corporation organized in 1971. On April 3, 1973 all stock (100,000 shares) of the corporation was acquired by the defendant Kellwood Company at a price of $1.65 per share. Kellwood retained Jerome H. Klenke, an original shareholder and the former president of Aquarius and gave him an option to purchase 50% of the stock. The fact that Klenke was to own 50% of the stock was allegedly not disclosed to plaintiffs at the time of the sale, and in January, 1974, plaintiffs filed this suit to set aside the sale on that ground under Rule 10b–5. The district court, in a trial without a jury, held that there was no material nondisclosure under the Act, that reliance affecting the sale had not been proven, that the plaintiffs were guilty of laches, and that they were also barred from equitable relief by the doctrine of "unclean hands."

We hold the district court's finding that there was no material nondisclosure not clearly erroneous. In view of this we need not pass on the other findings of the trial court.

The district court succinctly set forth the salient facts in its memorandum opinion, 391 F.Supp. 927, and we set them out in the margin here.[1]

---

1. The original investment in Aquarius in 1971 was a total of $40,000. Defendant Klenke signed a three-year employment contract with Aquarius, which contained clauses that he

would spend his full time for Aquarius and would not compete with Aquarius during the three-year term. He received, under the terms of the contract, a salary as president of the company, and, additionally, he received 18,000 shares of Aquarius stock without charge. Each of the plaintiffs in this action invested $5,000 in the corporation originally, except plaintiff Knobbe, who invested $10,000. The stock of plaintiffs at the time of the sale on April 3, 1973, was sold by the plaintiffs as follows:

|  | Shares Sold | Original Investment | Sale Price of Stock |
|---|---|---|---|
| Ehrler | 15,325 | $ 5,000.00 | $25,286.25 |
| Knobbe | 20,650 | 10,000.00 | 34,072.50 |
| Shelley | 10,325 | 5,000.00 | 17,036.25 |
| Maurer | 10,325 | 5,000.00 | 17,036.25 |
| Powers | 10,325 | 5,000.00 | 17,036 25 |

In late 1972, dissension arose in the company, and on January 11, 1973, defendant Klenke was removed from his position as president as a result of disagreement on policy matters and because the plaintiffs lacked confidence in defendant Klenke's business judgment. Plaintiff Ehrler replaced Klenke as president of the company. Late in the year 1972, the disputes on the Board of Directors became so severe that it was determined to find a buyer for the corporate stock. Ads were placed in the Wall Street Journal and a number of offers were received—fifty-five cents per share, seventy-five cents per share—and in January of 1973, defendant Kellwood offered $1.30 per share. These offers were all rejected by the stockholders.

In January of 1973, Aquarius was running at full capacity and the stockholders of Aquarius would not put in any more funds. Defendant Kellwood was purchasing approximately fifty percent of Aquarius' output. Klenke was dealing with Kellwood on behalf of Aquarius and plaintiff Ehrler was negotiating with Chris Kay Plastics Manufacturing Company (hereinafter Chris Kay), and on February 28, 1973, both Chris Kay and Kellwood made purchase offers of $1.60 per share at a February 28, 1973, meeting of Aquarius directors and shareholders. Both Ehrler and Klenke were instructed to attempt to obtain $1.65 per share from each company. Chris Kay and Kellwood were called on the telephone and top offers were received from both companies for Aquarius stock of $1.65 per share. At the February 28, 1973, meeting, the stockholders were informed that Kellwood's purchase offer was contingent upon Klenke entering into an employment agreement with Kellwood to operate Aquarius after the acquisition. The stockholders agreed to accept Kellwood's offer and to sell all the stock to Kellwood at $1.65 per share. Klenke

had advised that he would not work for Chris Kay.

On March 1, 1973, Mr. William N. Kelley of Kellwood mailed to each shareholder a letter containing an Agreement in Principle, which set out that the contract was contingent upon Klenke entering into an employment contract for a period of three years, and provided that Klenke would receive a salary "and such additional compensation and known Kellwood Employment Benefits as may be granted by the Compensation Committee of Kellwood." The Agreement in Principle provided that the closing of the transaction was contemplated not later than April 1, 1973, and would be submitted to the Kellwood Board on March 19, 1973. On March 13, 1973, amendment to the Agreement in Principle was mailed to each of the shareholders.

On March 5, 1973, Kelley of Kellwood wrote a letter to Klenke agreeing to permit Klenke to purchase fifty percent of Aquarius stock for $1.65 a share. This was accepted and approved by Klenke on March 29, 1973. Plaintiffs were not advised of this arrangement.

On March 13, 1973, Kelley had a meeting with plaintiffs Ehrler and Knobbe and told them in response to a question that key managers, such as Klenke, would have an option to purchase stock in the company. Kelley did not tell them that Klenke would own fifty percent of the stock and they did not inquire. There was also a discussion at that time concerning certain bad debts of the company and other aspects of the purchase.

On March 18, 1973, the plaintiffs advised Klenke that unless he returned 5,600 shares of his 18,000 shares of stock to the corporation, they would not enter into the final contract with Kellwood. On March 22, 1973, Klenke turned in to the corporation 5,600 shares and entered into an agreement which provided that the 5,600 shares would be divided among the other shareholders. This contract contained the following clause:

"Seven. The parties hereto hereby further mutually agree to hold the others harmless from any liability for any action taken by the other either individually or as members of the Board of Directors in the conduct of the business of the corp. whether said action be properly or improperly taken or authorized or unauthorized."

On April 1, 1973, a formal agreement was entered into among all of the stockholders of Aquarius to sell their stock to Kellwood and the sale was consummated on April 3, 1973.

On April 11, 1973, a press release was issued by Kellwood, disclosing that Klenke would own fifty percent of Aquarius, and announcing that Kellwood had acquired Aquarius. Some of the plaintiffs, after this press release was issued, went to see a lawyer, and in November of 1973 a letter was written by plaintiffs' lawyer to Kellwood and a suit was filed in January 1974.

The district court found that the failure of Klenke to disclose his intended purchase of 50% of the stock was not material under the circumstances of this particular case.

The court's reasoning was based on the following considerations: (1) the corporation was to be sold at the best obtainable price, $165,000; (2) the plaintiffs were at all times aware that Klenke was to get some rights to purchase stock; (3) they would not have relied on the fact that Klenke was to be a purchaser rather than a seller; (4) they had just fired Klenke as president because they did not trust him and therefore they did not rely on his judgment.

Plaintiffs urge the finding of the district court to be clearly erroneous. We cannot agree. There is ample evidence to support the conclusion reached by the trier of fact. The testimony was conflicting and it is the sole prerogative of the trier of fact to assess credibility of the witnesses. The trial court set forth many factors which led to the finding that Kellwood's alleged failure to disclose was not material to the plaintiffs' decision to sell the stock at $1.65 per share.

The parties were aware that Klenke was going to manage the company since Kellwood's offer was expressly conditioned on his assent to a three-year employment contract. Moreover, the record shows Klenke did not learn that he was to be permitted to buy 50% of the stock until five days *after* the decision to sell to Kellwood at $1.65 per share was made by the plaintiffs. Nondisclosure of a fact non-existent at the time of the decision to sell could not be material to the sale. The sale price resulted in a profit to the incorporators of 250% in two years—more than twice the book value. It is true that a violation of 10b–5 is not excused by a fair and adequate purchase price, but the purchase price is a factor which may be considered in determining whether the plaintiffs would have acted differently had they known of Klenke's retention of an interest in the corporation. This lends support to the trial judge's finding that there was no violation, that is, that no material nondisclosure occurred which would have affected plaintiffs' willingness to sell at the price they did and under the circumstances that they did.

In *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), we recognized that a material nondisclosure must concern facts which a reasonable person would consider important in deciding what he should do in a particular transaction. Under certain circumstances, failure to disclose the identity of a true purchaser of stock may well affect a reasonable person's decision to sell. *Id.* at 734. However, this objective test for materiality is not to be confused with the subjective test for reliance, which is whether the particular plaintiffs would have acted differently if the fact had been disclosed to them. This test substitutes the individual plaintiff for the reasonable person. *Id.* at 735.

Using these standards we are satisfied that the district court's finding that Klenke was to be a purchaser of 50% of the stock was not material under the circumstances, and if disclosed would not have influenced these plaintiffs to act differently.

The judgment is affirmed.