Jerome I. FELDMAN, et al., Plaintiffs,

v.

PIONEER PETROLEUM, INC., Frontier Corporation, The Estate of William D. Bradford, John H. Burgher, Fidelity Bank, N.A., The Estate of Grady D. Harris, Arthur Young & Company and James L. Houghton, Defendants.

No. CIV 77–0012–R.

United States District Court, W.D. Oklahoma.

Feb. 28, 1985.

Edward Labaton, Goodkind, Weschsler, Labaton & Rudoff, New York City, R.C. Jopling, Jopling & Blankenship, Oklahoma City, Okl., for plaintiffs.

Edward Little, White & Case, Martin Obermaier & Morvill, Silberfeld, Danziger &

Bangser, New York City, James P. Linn, James A. Kirk, J.D. Helms, William P. Warden, Linn, Helms, Kirk & Burkett, J. William Conger, Hartzog, Conger & Cason, William G. Paul, Harry A. Woods, Jr., Brooke Smith Murphy, Michael M. Stewart, Earl A. Skarky, Crowe & Dunlevy, Oklahoma City, Okl., John Matson, New York City, Burck Bailey, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., J. Stephen Welch, John H. Burgher, Jr., Schuman & Welch, P.C., Tulsa, Okl., for defendants.

## ORDER

DAVID L. RUSSELL, District Judge.

This action was commenced in 1976 in the United States District Court for the Southern District of New York and was subsequently transferred by agreement to the Western District of Oklahoma. The complaint seeks legal damages or in the alternative rescission and restitution based on violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5, and common law fraud. Initially, the Court determined that this case could be maintained as a class action. The class, however, was subsequently decertified, and the suit is now brought by some seventy investors who acquired limited partnership interests in the 1972 oil recovery program created by the late William D. Bradford. The sale of interests in the 1972 program was accomplished by Bradford and his fellow promoter, John H. Burgher[1] via the Prospectus,[2] a document entitled "Confidential Memorandum—William D. Bradford Partnership." This Prospectus was distributed to potential investors in New York and nine other states.

Under the plan as described in the Prospectus, each partnership would consist of Bradford, as the sole general partner, and a number of limited partners. Each partnership was to be divided into two tiers—a first-tier partnership and a second-tier partnership. The limited partners' investment in the first-tier would constitute the partnership's capital and would be used to purchase a working interest in an oil and gas lease from Pioneer Petroleum. The purchase price was intended to cover Pioneer's costs of drilling wells and other expenses. Approximately 90% of the capital contributed by the limited partners would be allocated by Pioneer to "intangible drilling and development costs." This would entitle each limited partner to deduct 90% of his investment for income tax purposes. Once the first-tier partnership leasehold had economic value, the second-tier would be created. According to the Prospectus, the general partner would arrange to finance the second-tier partnership's venture into oil development by selling a carved-out production payment ("COPP") for a price equal to the total capital contribution in the first-tier partnership. The COPP would be payable only out of the oil and gas revenues from the first-tier partnership's leasehold, and would be sold to an outside lender. The sale of the COPP would be analogous to a non-recourse loan. A limited partner participating in the second-tier partner-ships would be entitled to another tax deduction of approximately 90% of his initial investment because the COPP funds would also be allocated to expenses and intangible drilling and development costs of the second-tier leasehold.

Thus, if a limited partner invested $10,-000.00 in the first-tier partnership and elected to participate in the second-tier, the investor would receive income tax deductions in the amount of $18,000.00.

The Prospectus included an opinion letter regarding the tax consequences of the

---

1. By agreement John H. Burgher was dismissed from this action in an Order dated April 29, 1983.

2. There were actually three prospectuses which were identical except that they related to the A–B Partnership, the C–D Partnership and the

E–F Partnership respectively. Also in the A–B Partnership Prospectus Ronald Hill was listed as a reference; upon his resignation from Fidelity Bank the name of Fidelity President, Grady Harris was inserted in the C–D and E–F Partnership Prospectuses.

transaction. This letter, dated March 13, 1972, was on the letterhead of Defendant Arthur Young and Company and signed by Defendant James L. Houghton.

The Plaintiffs contend that William D. Bradford made material misrepresentations in the Prospectus presented or shown to each investor in order to induce them to purchase limited partnerships, that they relied on the misrepresentations, and sustained damages as a result thereof.

Further Plaintiffs argue that the Arthur Young-James Houghton (hereinafter "AY-JH") opinion letter contained in the Prospectus was materially false and misleading in that (1) it failed to disclose the substantial risks to the tax deductions promised in the Prospectus, (2) it failed to disclose the substantial risks associated with obtaining a COPP loan from an outside lending source, and (3) it failed to disclose the variance between the opinion letter's assumed facts and those facts set forth in the Prospectus. It is claimed that the association of AY, with its reputation as a Big Eight accounting firm, and James Houghton, with his reputation as an expert in oil and gas law, with the Bradford Partnerships and the presence of the AY-JH opinion letter in the Prospectus served as legitimizers of the Program. Plaintiffs allegedly placed reliance on the opinion of AY and Houghton when considering a tax shelter investment in the Bradford Programs.

Plaintiffs allege that Fidelity Bank, N.A. (hereinafter "FBNA") aided and abetted Bradford's scheme in two ways. First, Ronald Hill, who in early 1972 was Vice President and the principal oil and gas lending officer at FBNA and who was in charge of the Bradford and Pioneer accounts, authorized the use of his name in the A–B Partnership Prospectus as a reference. In August, 1972, Hill resigned from FBNA and the name of Fidelity's President, Grady D. Harris, was substituted as a reference in the C–D and E–F Partnership Prospectuses. Second, Plaintiffs contend

that Harris,[3] as President of FBNA, executed a document dated September 25, 1972, that evidenced a payment of $800,-000.00 to the A Partnership secured only by a COPP when in reality no monies had been advanced. Other transactions alleged to be shams occurred in October and December. On Friday, October 27, 1972, FBNA made an $800,000.00 loan to the A Partnership which was repayable on Monday, October 30, 1972. By COPP documents dated December 10, 1972, and executed by Harris, FBNA purported to advance $800,000.00 to the C–D Partnership and $800,000.00 to the E–F Partnership.

It is asserted that FBNA's role in carrying out a sham loan to the A–B Partnership was essential to the success of Bradford's scheme. It assured the successful selling of the C–D and E–F Partnerships because the loan to the A–B Partnership gave credibility to the other Bradford Programs. It is alleged that the sale of the loan was the primary reason investors purchased interests in the later partnerships.

In 1975, the Internal Revenue Service commenced a review of the Bradford Partnerships. As yet the resultant Tax Court litigation is unresolved.

The procedural posture of this action is as follows: In light of the fact that there are some seventy individual Plaintiffs who reside outside the Western District of Oklahoma and in view of the many issues requiring individual inquiry, the parties suggested the possibility of selecting several Plaintiffs who are representatives of the various groups of plaintiffs and presenting a trial of their case in its entirety. Plaintiffs Jerome I. Feldman, Barry M. Brookstein, Albert E. Abraham and Albert A. Rettig were selected by all parties as representative of the various groups of investors.

## I.

■ On the date of trial, April 24, 1983, counsel for the Estate of Grady D. Harris,

---

**3.** Grady D. Harris died before the commencement of this lawsuit and thus the Estate was sued by Plaintiffs.

Jr., presented a copy of a Final Discharge entered in the District Court of Oklahoma County in the matter of the Estate of Grady D. Harris, Jr., deceased, No. P–74–1736, dated July 15, 1981. Counsel then made an oral Motion to Dismiss the Estate as a party to this action.

Before the Final Discharge was entered, the co-executors gave the statutorily required notice but did not give personal notices to any of the Plaintiffs in this action. The question before the Court is whether the entry of the Final Discharge bars continuation of the present action as to the Estate.

The Oklahoma Supreme Court, in *Oberlander v. Eddington,* 391 P.2d 889 (Okla. 1964), held that a Decree of Distribution under a will entered after notice and hearing is conclusive as to the rights of all parties interested in the estate in the absence of fraud, mistake, or collusion. A Decree of Distribution is ordered upon the final settlement of the accounts of the executor or administrator under 58 O.S. § 631 (1981). Subsequently, after the estate has been fully administered and the executor has paid all money and delivered all properties to entitled parties, a Discharge of the Representative is entered. 58 O.S. § 691 (1981).

In *Burford v. Stuart,* 412 P.2d 169 (Okla.1966), the Plaintiff did not perfect an appeal from the Order Approving the Final Account of the Executrix, which decreed distribution of the estate, but appealed only from the subsequent order authorizing the discharge of the executrix. The Oklahoma Supreme Court concluded that since no appeal had been taken from the Order Approving the Final Account of the Executrix, such Order and decree were conclusive as against Plaintiff's rights as a contingent beneficiary of an insurance policy. It was determined that the executrix had fulfilled her duties, and was entitled to be discharged under 58 O.S. § 595 and § 691.

The Tenth Circuit has recognized Oklahoma's general rule of finality in *Droppleman v. Horsley,* 372 F.2d 249 (10th Cir. 1967), an action based on alleged conspiracy in a probate matter. In disallowing what amounted to a collateral attack on the distribution of the estate, the Court stated:

"[J]udgment [of the probate court] until reversed or vacated by the proper procedure in that court or some other tribunal of that state authorized thereto by its laws must be accepted here, not only to estop appellant to be heard on his allegations of fraud, [contained in a collateral complaint] but as a bar against the maintenance and prosecution of that complaint in this court."

*Id.* at 251 (quoting *Folk v. Monsell,* 71 F.2d 816, 818 (10th Cir.1934)).

This Court is persuaded that the Final Discharge entered by the District Court of Oklahoma County is a final order adjudicating the rights of all parties having or seeking an interest in such Estate. It is equally clear that the Plaintiffs seek to obtain an interest in that Estate via this action. Consequently, proceeding with the present action as against the Estate would be allowing a prohibited collateral attack upon the Final Discharge. *Droppleman, supra; Oberlander, supra; see also, Cox v. Mackenzie,* 70 Ariz. 308, 219 P.2d 1048 (1950).

Although it may seem a harsh result, the Plaintiffs have been aware that a party to the case at bar was in the probate court and could easily have kept abreast of those proceedings in order to prevent the entry of the Final Discharge. For the foregoing reasons, the Estate of Grady D. Harris, Jr., is dismissed with prejudice from this action.

## II.

Commencing April 24, 1983, the Court heard the cases of the four test plaintiffs. At the outset of the trial, the parties raised the issue of the applicable statute of limitations with respect to Plaintiffs' federal securities fraud claims.

Plaintiffs contend that the statutes of limitations of the states where Plaintiffs sustained their losses are determinative, while Defendants support the application of Oklahoma's two-year period of limita-

tions for fraud actions set forth in 12 O.S. § 95 (Third). In this regard, Plaintiffs maintain that even if the Oklahoma two-year statute governs, the action is timely since the Plaintiffs could not have learned of the alleged fraud more than two years prior to the commencement of this action.

■ It is agreed that no specific federal statute of limitations exists for suits brought under § 10(b). Thus, according to the U.S. Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), such actions are subject to the limitations period applicable to fraud actions by the law of the forum state.

Plaintiffs suggest that in the Tenth Circuit the law of the state where the violation occurred governs with respect to limitations, citing *Hackbart v. Holmes*, 675 F.2d 1114 (10th Cir.1982). Plaintiffs contend, without citation of authority, that the injury occurred where the payments for the limited partnership interests were made, and thus the statutes of limitations in the Plaintiffs' resident states should be followed.

On review, it appears that the law in the Tenth Circuit on this issue is somewhat unclear. In 1970, the Tenth Circuit held that "the limitations statutes of the forum state in which the alleged prohibited acts occurred applies." *deHaas v. Empire Petroleum Co.*, 435 F.2d 1223, 1225 (10th Cir.1970). A year later the Court stated, "The settled rule is that where a federal statute is silent as to the appropriate period of limitations, the appropriate period of limitations of the forum state is applied." *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 103 (10th Cir.1971). In 1980, the statute of limitations "of the state where the alleged violation occurred" was applied in *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 (10th Cir.1980). In *Ohio v. Peterson, Lowry, Ralls, Barber & Ross*, 651 F.2d 687, 691 (10th Cir.1981), the limitations period supplied by the law of the forum state was held applicable. Finally in *Hackbart v. Holmes, supra*, the Court stated that the appropriate statute is that "of the state in which the alleged violation occurred." at 1120. However, as Defendants note, the comment in *Hackbart v. Holmes, supra*, may be construed as dictum since there the parties had agreed that the Colorado statute of limitations for fraud applied. Thus, in light of *Hochfelder* and *Ohio v. Peterson, Lowry, Ralls, Barber & Ross, supra*, the statement in *Hackbart* perhaps should not be construed literally.

The Tenth Circuit decisions may be reconciled if they are read as holding that the forum state's law of limitations of actions is applicable. However, application of Oklahoma law may require the Court to apply another state's statute of limitations.

Title 12 O.S. § 105 (1981), provides:

"The period of limitation applicable to a claim accruing outside of this state shall be that prescribed either by the law of the place where the claim accrued or by the law of this state, whichever last bars the claim."

In *Brickner v. Gooden*, 525 P.2d 632 (Okla.1974), the Oklahoma Supreme Court decided that where a tort claim accrued is determined by deciding which state has the most significant relationship to the occurrence and the parties. In this regard, the Oklahoma Supreme Court held:

The factors to be taken into account and to be evaluated according to their relative importance with respect to a particular issue, shall include:

(1) The place where the injury occurred,

(2) the place where the conduct causing the injury occurred,

(3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(4) the place where the relationship, if any, between the parties occurred.

*Id.* at p. 637.

The process is one of "counting the relevant contact points of each state, and applying the law of that state which has the greatest number." Note, "Oklahoma's

Borrowing Statute," 2 Okla.City U.L.Rev. 107, 115 (1977).

The Plaintiffs argue that the place where injury occurred is where Plaintiffs paid for the limited partnerships; in other words, in each of the ten states where Plaintiffs reside.[4] The first factor becomes of lesser importance when "such as in the case of fraud and misrepresentation ..., there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury." *Restatement (Second) of Conflicts of Laws* § 145 comment (e) on subsection (2) (1969).

With respect to the second factor, the conduct causing the alleged injury appears to have occurred in Oklahoma since the Prospectus and the Arthur Young opinion letter were prepared in Oklahoma, and the Fidelity loan arranged in Oklahoma.

The third factor deals with the residences of the parties. As previously stated Plaintiffs' residences are scattered amongst ten states. However, the Defendants are two Oklahoma corporations, an Oklahoma bank, two deceased residents of Oklahoma whose estates are being administered in Oklahoma courts by Oklahomans, two living residents of Oklahoma, and a national accounting firm, whose alleged wrong-doing arises out of its Oklahoma offices.

Clearly, the second and third factors weigh heavily in favor of Oklahoma.

The fourth factor to be considered is the place where the relationship between Plaintiffs and Defendants arose. It appears that the Bradford partnerships were Oklahoma limited partnerships. The partnership accounts were maintained in Oklahoma. In addition the Plaintiffs' claims concern transactions involving oil and gas wells drilled in Oklahoma.

■ On review and consideration of the foregoing facts the Court is persuaded that

Oklahoma is the state with the most significant relationship to the occurrence and to the parties and thus its two-year statute of limitations shall apply to the Plaintiffs' federal securities claims and their common law fraud claims.

■ In this regard, the Court finds that the statute as it pertains to both causes of action "begins to run when the aggrieved party discovers, or should have discovered by the exercise of reasonable diligence, the facts constituting the fraud." *Aldrich v. McCullough Properties, Inc.*, 627 F.2d 1036, 1041 (10th Cir.1980) (securities claims); *In re Woodward*, 549 P.2d 1207, 1208-9 (Okla.1976) (common law fraud claims); 12 O.S.1981 § 95(3).

■ The parties agree that the statute was tolled from the date the class action was filed, March 26, 1976, to May 7, 1981, when Judge Daugherty decertified the class. This Court also finds that decertification acted as a dismissal not on the merits and, therefore, the Oklahoma "saving statute" is applicable to the common law fraud claims, 12 O.S.1981 § 100, and to the federal securities claims. *Cf. Woosley v. Hi-Plains Harvestore, Inc.*, 550 F.Supp. 161 (W.D.Okla.1981). Under the facts as presented via the four test Plaintiffs, the Court finds that the letters sent to the limited partners by Hurdman & Cranstoun in June, 1974, triggered the statute. Therefore, the application of § 100 has the effect of enlarging the two year limitation period as to the four test Plaintiffs. An examination of the record reveals that the claims of the four test Plaintiffs are not barred by the statute of limitations.

### III.

At the close of the Plaintiffs' case, all the Defendants moved to dismiss pursuant to Rule 41(b), Federal Rules of Civil Proce-

---

**4.** New York is the predominant state of residence for the Plaintiffs. However, New York is an inappropriate forum as Oklahoma will not borrow the limitations law of a jurisdiction in which the Defendant cannot be summoned. *Western Natural Gas Co. v. Cities Service Gas Co.*, 507 P.2d 1236, at 1243 (Okla.1972) *appeal*

*dism., cert. denied,* 409 U.S. 1052, 93 S.Ct. 559, 34 L.Ed.2d 506 (1972). In this regard it is evidenced that Defendant Fidelity Bank cannot be sued anywhere except Oklahoma. *See* 12 U.S.C. § 94; *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976).

dure. In considering whether to grant Defendants' motions, the Court has wider latitude than in considering whether to direct a verdict in a jury trial. In a non-jury trial the Court is the trier of the facts and may weigh and consider the evidence. 5 Moore's Federal Practice ¶ 41.13[4] p. 41-193. The Tenth Circuit has noted in *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 436 (10th Cir.1983) that "[t]he fact finding process under a Rule 41(b) motion calls for an adjudication upon the merits of the plaintiff's claims and may involve a weighing of the evidence as it stands at the close of the plaintiff's case." In *Blankenship v. Herzfeld*, 661 F.2d 840, 845 (10th Cir.1981), the Court held that " '[i]n a case tried without a jury, the trial court is not required to consider the evidence in the light most favorable to the plaintiff in determining whether to grant a motion to dismiss under Rule 41 made at the completion of the plaintiff's case.' " (quoting *Woods v. North American Rockwell Corp.*, 480 F.2d 644, 645-6 (10th Cir. 1973)).

Before determining the purely evidentiary questions, the Court will first address whether the equitable relief requested is available to the Plaintiffs. It is necessary for a party seeking rescission and restitution to act with all reasonable dispatch to preserve this remedy. *Gannett Co., Inc. v. Register Pub. Co.*, 428 F.Supp. 818 (D.Conn.1977); *Ehrler v. Kellwood Co.*, 391 F.Supp. 927 (E.D.Mo.1975); *aff'd.* 521 F.2d 1347 (8th Cir.1975); *Hickman v. Groesbeck*, 389 F.Supp. 769 (D.Utah 1974). The Court has already determined that the four test Plaintiffs had information sufficiently suggestive of the alleged fraud by June, 1974. There was no evidence presented to the Court to indicate the Plaintiff's sought rescission and restitution from Bradford prior to the filing of this action in March, 1976. "Where parties have the right to rescind, they cannot delay the exercise of that right to determine whether avoidance or affirmance will be more profitable to them." *Hickman*, 389 F.Supp. at 780. The Court finds the Plaintiffs did not

act with all reasonable dispatch as nearly two years elapsed prior to their seeking this relief. Consequently, they have forfeited this remedy.

The Defendants forcefully contend that no legal relief is available as the Plaintiffs have not suffered any actual damages. Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), bars recovery under the Act of any amount "in excess of [a plaintiff's] actual damages." *Estate Counseling Services, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527 (10th Cir.1962). Thus, the customary measure of damages in a § 10(b) action is a plaintiff's out-of-pocket loss. *Hackbart v. Holmes*, 675 F.2d 1114 (10th Cir.1982).

It is clear that the tax advantage received by a plaintiff is an appropriate consideration in evaluating actual damages in a tax shelter case such as this. "The actual damages principle requires that a rescissional or restitutional award be 'reduced by any value received as a result of the fraudulent transaction.' " *Austin v. Loftsgaarden*, 675 F.2d 168, 181 (8th Cir. 1982) (quoting *Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357, 1361 (8th Cir.1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978)); *see also Bridgen v. Scott*, 456 F.Supp. 1048, 1061 (S.D.Tex. 1978).

There is a serious question whether the Plaintiffs in this case have suffered any damage whatsoever as a result of investing in the Bradford Partnerships.

The evidence demonstrated that each of the four test plaintiffs deducted 180% of his investment in the partnerships. Thereafter, in 1975, the Internal Revenue Service audited the investors deductions and found that a valid COOP loan had not been acquired and that the tax shelter was a sham. However, to date none of the investors has been required to pay any additional taxes with respect to their 1972 federal income

tax returns.[5] In fact, according to Plaintiff Rettig's testimony all the tax disputes involving investors in the Bradford Partnerships have been designated by the IRS as "settlement vehicles". This means that the IRS is attempting to settle the disputes by offering to allow 100% of each investment as a deduction to the investor.

Plaintiff Feldman stated that his $200,-000.00 investment has provided him with approximately $280,000.00 in tax benefits and cash income ($250,000.00 in cash retained due to the tax benefits; $30,000.00 income[6] from the investment). Thus, in effect, Feldman has retained an $80,000.00 profit.

If Plaintiff Feldman settled his tax dispute, he would be allowed a deduction of $200,000.00 rather than the $360,000.00 he claimed. The result would be $140,000.00 in cash retained due to the tax benefits, and $30,000.00 income from the investment, giving him a return of $170,000.00 on his $200,000.00 investment. Thus, he would sustain $30,000.00 in damages as a result of his investment. However, such damages are purely speculative at this point as no settlement has yet occurred.

The Court concludes that the Plaintiffs have failed to prove they have suffered actual loss even though the tax benefits promised in the Prospectus may not materialize.[7] Consequently, the Court grants the Defendants' Motions to Dismiss as the Plaintiffs have failed to prove an essential element of both their securities claim and their common law fraud claim.

Although this finding is dispositive of the present action in its entirety, the Court will also address the Plaintiffs' proof on other elements as to each Defendant.

## IV.

In order for the Plaintiff's to prevail against a primary violator of § 10b and Rule 10b–5, they must prove by a preponderance of the evidence the following:

1. that the conduct complained of occurred in connection with the purchase or sale of a security,

2. that the violator made an untrue statement of a material fact, or failed to state a material fact which was necessary in order to make the statements which were made not misleading,

3. that the violator acted knowingly, with a motive embracing intent to deceive, manipulate, or defraud; or with recklessness such as would be considered an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the actor or so obvious that he must have been aware of it,

4. that Plaintiff relied on such misrepresentation, and

---

**5.** While the Court might have been receptive to factoring in the investors attorney's fees in tax court, no evidence on this element of damage was introduced. Additionally, as early as December 31, 1980, this Court indicated its willingness to consider damages based on the value difference between the investment purchased and the price paid, however, no expert testimony was introduced positing such valuations.

**6.** The Plaintiffs concede that they have received a cash return on their investments although it is estimated at a trivial 15–20% of their total investment over ten years. It is uncontroverted that the partnerships have ceased to produce .any income and are not saleable at this time.

**7.** AY–JH further argues that even if Plaintiffs could prove damages they could not recover those losses from Arthur Young or James

Houghton. An element of any § 10(b) damage claim must be "loss causation" meaning that a causal connection must exist between the misrepresentations and the economic harm complained of. *Croy v. Campbell,* 624 F.2d 709, 714 (5th Cir.1980). It is AY & JH's position that any loss which occurred was caused from the failure to drill successful oil and gas wells. AY–JH maintain that they gave no assurance as to the success of the drilling venture and thus any losses arising from the unprofitable partnerships were not suffered as a proximate result of the allegedly misleading statements of AY–JH.

The Court rejects this theory since a large portion of damages if any would be sustained as a result of the IRS disallowance of the 180% deduction, and Plaintiffs contend that AY–JHs misrepresentations induced them to invest in the partnerships by supporting the validity of the 180% deduction.

5. that the Plaintiff was damaged as a proximate result of such misrepresentation.

*Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir.1975); *Stevens v. Vowell,* 343 F.2d 374 (10th Cir.1965).

 It is also possible for the Plaintiff to recover against certain Defendants if they can establish such Defendants were aiders and abettors to the primary violator. To establish aider and abettor liability, the Plaintiffs must show:

1. fraud by the primary violator,
2. knowledge of the fraud by the aider and abettor, and
3. substantial assistance by the aider and abettor.

*Hackbart v. Holmes,* 675 F.2d 1114 (10th Cir.1982); *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478 (2nd Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Zabriskie v. Lewis,* 507 F.2d 546 (10th Cir. 1974).

 After careful consideration of the Plaintiffs' presentation and the Defendants' through cross-examination, the Court makes the following findings as to each Defendant in light of the above stated case law:

**1. William D. Bradford:**

The Plaintiffs have shown by a preponderance of the evidence that the prospectus produced and disseminated by Bradford for the purpose of selling the limited partnerships was materially misleading subsequent to Pioneer's purchase of the COPP loan via Fidelity; that the appearance of a COPP loan from an outside lender served to enhance the saleability of the partnerships and was relied upon by the Plaintiffs in their decision to purchase; that Bradford acted knowingly with an intent to deceive subsequent purchasers as to the viability of obtaining an outside lender.

However, in light of the Court's finding on the issue of damages, the Motion to Dismiss by Defendant Bradford is granted.

**2. Pioneer Petroleum, Incorporated:**

The Plaintiffs have shown by a preponderance of the evidence that Pioneer via Bradford is liable as a primary violator. However, in light of the Court's finding on the issue of damages, the Motion to Dismiss by Defendant Pioneer is granted.

**3. Fidelity Bank, N.A.:**

The Court finds that while Harris was not involved in the planning or dissemination of the Bradford Prospectus the preponderance of the circumstantial evidence indicates he was aware of the existence of the Prospectus, and the investment nature of the program. Further, the evidence, at this stage of the litigation, indicates that Harris rendered substantial assistance to the fraudulent scheme by creating the appearance of a valid COPP loan. The various and sundry methods employed by Harris in creating this image evidence an extreme departure from ordinary care.

Consequently, the Court is of the opinion the Plaintiffs have shown that Fidelity is liable as an aider and abettor having established fraud by Bradford, Harris' substantial assistance to the primary violator, and a recklessness by Harris that amounts to culpable scienter. However, in light of the Court's finding on the issue of damages, Fidelity's Motion to Dismiss is granted.

**4. James L. Houghton and Arthur Young & Company:**

 The Plaintiffs claim these Defendants are primarily liable because the Opinion Letter contained in the Prospectus was materially false and misleading in the following ways:

(1) it failed to disclose the substantial risks to the tax deductions promised in the Prospectus;

(2) it failed to disclose the substantial risks associated with obtaining the COPP loan from a lending source and,

(3) it failed to disclose the variance between the Opinion Letter's assumed facts and those set forth in the Prospectus.

With regard to disclosure of the risks in obtaining the tax deduction, the Plaintiffs urge that Rev.Ruling 72–135 was pertinent to the proposed transaction. The Court finds that Rev.Ruling 72–135 deals with a factual situation dissimilar to the present case, as the Opinion Letter points out. It does not deal with COPP loans from a general partner to a limited partner, but with a non-recourse loan from a general partner to a limited partner to fund part of the latter's subscription price. Additionally, any conflict in tax treatment of the transaction would be governed by 26 U.S.C. § 636(a),[8] rather than by Rev. Ruling 72–135 because a revenue ruling which "operates to create a rule out of harmony with the statute is a mere nullity." *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936). Consequently, information based on 72–135 would have been inapposite and immaterial to the investor. Plaintiffs also contend that the case of *Bernuth v. Commissioner,* 57 T.C. 225 (1971), aff'd, 470 F.2d 710 (2nd Cir.1972), should have been discussed in the Opinion Letter as it related to the possibility of obtaining a deduction of 180%. *Bernuth,* simply stated, held that when a drilling contract is done on a turnkey basis, the taxpayer may have to come forward and prove the reasonableness of the drilling deductions. Once again, the scenario presented by Bradford to Houghton, and on which he was to base his opinion, said nothing about the type of drilling contract between Pioneer and Frontier or the amount Bradford would suggest the limited partners allocate to intangible drilling costs. The Court finds Houghton was not obliged to unduly broaden the scope of the Opinion Letter by discussing or seeking out aspects on which no advice had been sought. In so saying, the Court does not

indicate that it would condone an accounting firm's avoidance of obviously pertinent issues. However, the Court does not expect the author of an opinion letter to assume fraud by the promoter and accordingly fill such a letter with all information in any way tangential to the question posited. *Cf., Croy v. Campbell,* 624 F.2d 709 (5th Cir.1980) (Plaintiffs urged court to adopt position that tax attorney's failure to investigate demonstrated recklessness. "The mere fact that [tax attorney] made tax analysis based upon information presented to him, was not an extreme departure from the standards of ordinary care." *Id.* at 715); *Mendelsohn v. California Underwriters, Inc.,* 490 F.Supp. 1069 (N.D.Cal. 1979) (Court held accountants had no duty to prospective investors to disclose knowledge, if any, where they did not attempt to use any inside information to trade for their own account, and did not substantially assist fraud in question. *Id.* at 1086–87); *SEC v. Haswell,* [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) § 97, 156 (W.D. Okla.1977) (Bond counsel under no duty to insist upon review of offering circular in final form, nor under a duty to withdraw opinion from circular when facts known to him were insufficient to put him on notice of fraud). In sum, the Court finds that the Opinion Letter was, by its express terms, very limited in scope, and that the conclusion reached had a reasonable basis in law. *Cf., Anderson v. Helvering,* 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940); *Brountas v. Commissioner,* 692 F.2d 152 (1st 1982); *Dillingham v. United States,* 81–2 U.S.Tax Cas. (CCH) ¶ 9601 (W.D.Okla. 1981); 26 U.S.C. § 636(a).

The second category of omissions focuses on the risks of obtaining a COPP loan. Page two of the Prospectus expressly states the risks involved in successfully

**8.** 26 U.S.C. § 636(a) (1972):
Income tax treatment of mineral production payments
(a) Carved-out production payment.—A production payment carved out of mineral property shall be treated, for purposes of this subtitle, as if it were a mortgage loan on the property, and shall not qualify as an economic interest in the

mineral property. In the case of a production payment carved out for exploration or development of a mineral property, the preceding sentence shall apply only if and to the extent gross income from the property (for purposes of section 613) would be realized, in the absence of the application of such sentence, by the person creating the production payment.

completing the oil recovery program. Also outlined are post-production problems and other economic factors which could render the well uneconomic. It seems almost too elementary to state, given the credentials of these Plaintiffs, that one could not carve out a production payment from a well which was not economical. Nevertheless, the Plaintiffs contend the Opinion Letter should have contained words to this effect. The Court finds the Prospectus adequately sets forth the risk in obtaining a COPP, and the Opinion Letter did not need to contain duplicative information.

In this same category, the Plaintiffs also urge the Opinion Letter should have disclosed the following details regarding the COPP: (1) that before making a COPP loan a lender would require more data than is available prior to drilling, (2) that no commitment had been made by a lending source prior to the drilling, and (3) that neither Pioneer nor Bradford could afford to make the COPP loan. The Prospectus states that "[r]eservoir data required to fully evaluate the feasibility of waterflooding the subject properties are of poor quality and very limited quantity." The Court wonders how an investor could think a lender would commit to a COPP loan prior to drilling when the projected feasibility of the entire project was based on such data, or that additional data subsequent to drilling would not be essential. Nevertheless, the Court finds that once again the Plaintiffs seek to have these Defendants include the irrelevant as it pertains to the Opinion Letter fact scenario, and the obvious as regards the risks of the program. Lastly, it was Bradford who promised an outside lender. This Court has already found that the Plaintiffs relied on that representation. Therefore, failure to address whether Pioneer or Bradford could afford to make the COPP loan would be an immaterial omission.

The final omission alleged is failure of the Opinion Letter to point out the variance between it and the Prospectus regarding the lending source. The Court finds this allegation substantially the same as the last one mentioned by the Plaintiffs in their second group of alleged omissions. The variance was obvious; the fact scenario of the Opinion Letter was not the one relied on; failure to point out the variance was an immaterial omission.

Aider and abettor liability against these Defendants is premised primarily on the same facts. The Court finds that the Opinion Letter, which is not materially misleading, did not render substantial assistance to the primary violator. Additionally, the Court finds that Houghton did not render substantial assistance by recommending and contacting a local law firm on Bradford's behalf to draft the COPP documents. Secondary liability also fails for lack of scienter. The Court finds that knowledge of the primary fraud, or recklessness which would suffice for such scienter, was not established by a preponderance of the evidence as to these Defendants.

The Court is not holding James Houghton and Arthur Young & Company liable for the representations made throughout the Prospectus. While there was some evidence that Houghton made a change in the last draft of the Prospectus, there was no evidence that he was ever asked to, or did in fact, render an opinion on the entire plan as proposed by Bradford.

For the foregoing reasons, and in light of the Court's finding on the issue of damages, the Motion to Dismiss by Defendants James Houghton and Arthur Young & Company is granted.

### 5. Frontier Corporation:

█ The Court finds that Bradford was not representing Frontier while promoting the 1972 partnerships; that Frontier was not involved in the planning and promotion of the Prospectus; that Frontier made no statements whatsoever regarding the tax aspects or financial arrangements pertaining to the drilling activities of Bradford; that, in the context of aider and abettor, Frontier's participation in the Bradford

partnerships was limited to conducting drilling operations on the oil and gas leases which did not substantially assist Bradford in the perpetration of the fraud via the COPP loan. Therefore, Frontier's Motion to Dismiss is granted.

The Plaintiffs' common law fraud claims, which must be established by clear and convincing evidence, *Barnett v. Life Insurance Co. of the Southwest*, 562 F.2d 15 (10th Cir.1977); *Barriner v. Stedman*, 580 P.2d 514 (Okla.1978), fail for the same reasons given as to each Defendant on the Plaintiffs' securities action.

*Summation*

The Court has determined that the Oklahoma statute of limitations applies to the Plaintiffs' securities and common law fraud claims; that the claims of the four test Plaintiffs are not barred by the statute of limitations; that the present action would be a collateral attack on a final order and, accordingly, dismisses the action with prejudice as to the Co-executors of the Estate of Grady D. Harris, Jr.; that the Plaintiffs' proof has failed to establish liability as to James Houghton, Arthur Young and Company, and Frontier Corporation, and the Court dismisses the action with prejudice as to these Defendants for that reason; however, the Court dismisses the action as to each Defendant, including a dismissal with prejudice as to William D. Bradford, Pioneer Petroleum, Incorporated, and Fidelity Bank, N.A., on the basis of the Plaintiffs' failure to establish damages.