**Jerrold SCHAFFER, On Behalf of Himself and All Others Similarly Situated, Plaintiffs,**

v.

**EVOLVING SYSTEMS, INC., George A. Hallenbeck, J. Richard Abramson, Roger A. Barnes, David Molny, Harry B. Fair, Donald Dixon, Jim Ross, Jeff Finn, and Robert J. Loarie, Defendants.**

**Pan American Export Trading, Inc., on Behalf of Itself and All Others Similarly Situated, Plaintiffs,**

v.

**Evolving Systems, Inc., George A. Hallenbeck, J. Richard Abramson, Roger A. Barnes, David J. Molny, Harry B. Fair, Donald R. Dixon, Robert J. Loarie, Goldman, Sachs & Co. BancAmerica Robertson Stephens, Hambrecht & Quist, and UBS Securities, Defendants.**

**Nos. 98–WY–1338–CB, 98–WY–1343–CB.**

United States District Court, D. Colorado.

Dec. 14, 1998.

William C. Fredericks,, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, for plaintiffs.

Boris Feldman, Wilson Sonsini Goodrich & Rosati PC, Palo Alto, CA, for Evolving Systems, Inc., Hallenbeck, Abramson, Barnes, Molny, Fair, Dixon and Loarie.

Bruce A. Featherstone, Featherstone & Shea LLP, Denver, CO, for Goldman, Sachs & Co., Banamerica, Stephens, Hambrecht & Quist, and UBS Securities.

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

BRIMMER, District Judge.

This matter is before the Court on three Motions to Dismiss: Defendants Evolving Systems, Inc.'s, Abramson's, Barnes's, and Molny's ("Evolving Defendants") Motion to Dismiss; Defendants Goldman, Sachs & Co.'s, Bancamerica Robertson Stephens's, Hambrecht & Quist's, and UBS Securities' (the "Underwriters") Motion to Dismiss; and Defendants Hallenbeck's, Fair's, Dixon's and Loarie's (the "Outside Directors") Motion to Dismiss. The Court finds and orders as follows:

### Background

Defendant Evolving Systems, Inc. ("the Company") is a Delaware Corporation that develops, markets, sells and supports software products that enable both established and new telecommunications companies to implement local number portability ("LNP") requirements.[1] LNP requirements were established by the Telecom Act of 1996, and require telecommunications companies to

---

1. These facts are taken from Plaintiffs' Consolidated Class Action Complaint. They are accepted by the Court as true for purposes of this motion.

give their customers the ability to retain their local phone number if they decide to switch to a different carrier. (Compl.¶ 3.) Officers and Directors of the Company, named as individual defendants in this lawsuit are as follows: George Hallenbeck, Chairman of the Board; J. Richard Abramson, President and CEO; Roger Barnes, CFO; David J. Molny, VP and Chief Technical Officer; Harry Fair, Vice Chairman of the Board; Donald R. Dixon and Robert J. Loarie, Directors. Each of these men signed, personally or by attorney-in-fact, the Company's Registration Statement.

Prior to the Class Period and its May 12, 1998, Initial Public Offering ("IPO"), the Company reported exceptional revenue growth, especially in its LNP-related businesses. (Compl.¶¶ 4, 43(a)) In early 1998 the Company filed the first of a series of registration statements with the SEC for an IPO of approximately four million shares, of which approximately one million shares were owned by corporate "insiders." However, beginning in the first quarter of 1998, the Company's growth slowed in the face of a decline in new contracts (¶¶ 5, 38, 39.) The facts demonstrating the existence of this adverse trend were discernible from the Company's financial statements for the quarter ending March 31, 1998.

In May, the Company chose to "go public" based on a Registration Statement dated May 11, 1998 and a Prospectus dated May 12, 1998, neither of which contained a disclosure of the decline in new business that was apparent from the March 31, 1998 financial reports. The Prospectus contained the Company's audited financial statements for the year ended December 31, 1997 that corroborated the Company's dynamic growth, particularly in the area of "unearned revenue and customer deposits." (Compl.¶ 44.) This area refers to revenue-producing contracts that are in the revenue "pipeline," but have not yet been performed. The Prospectus also contained positive representations regarding revenue and net income from the Company's March 31, 1998 financial statements. Defendants however, did not disclose other information from the March 31, 1998 financial statements that would have revealed a decline in new business. Specifically, the March 31 statements would have shown that while the Company had generated $20 million in LNP license fees and related LNP services in FY 1997, the decline in "unearned revenue and customer deposits" that had occurred in 1998 would have painted a picture of a Company whose new LNP business was shrinking. (Compl.¶ 46.)

On May 12, 1998, the Company, with participation from the underwriters named in this action, was able to successfully complete its IPO by selling 4.6 million shares of Evolving Systems common stock to the public at a price of $14 per share, for total proceeds of $64.4 million. Of the 4.6 million shares sold, nearly 29% were sold by Company insiders for sales proceeds of more than $18 million. Specifically, Hallenbeck and Fair each sold 500,000 shares for approximately $7 million each and Molny sold 10,000 shares resulting in approximately $140,000. In the first day of trading in Evolving Systems common stock, the price of the Company's shares jumped over 37% to close at $19.1875.

On or about June 17, 1998, the Company announced that it would report a loss of approximately ($0.06) to ($0.11) per share on revenue of only $10.5 to $12 million for the second quarter (ending June 30, 1998). The Company also disclosed that it had incurred an "extraordinary loss, net of income tax, of approximately $500,000 on early extinguishment of debt" related to a prepayment penalty on a loan. (Compl.¶ 54.) The press release quoted defendant Abramson as stating:

We are seeing slower sales cycles than expected in certain markets. Some of our customers have been slower in concluding contracts with respect to the solutions than we anticipated. We have recently learned that certain of these prospective contracts which we had expected to close and bring to revenue under our percentage of the completion revenue recognition policies in the second quarter, will not be signed and implemented in June....

(Compl.¶ 55.)

On June 18, 1998, the price of the Company's stock plunged from $15.25 to $9.50, a one day decline of 37%. On July 23, 1998, the Company announced that its actual second quarter results were worse than it had predicted on June 17. The next day, Evolv-

ing Systems stock fell from $8.625 to $5.685, more than 34%. All in all, Evolving Systems stock collapsed more than 72% from the stock's Class Period high of $20.50 per share reached just ten weeks earlier.

## A. Plaintiffs' Allegations

Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(b) and 23(b)(3) on behalf of all persons who purchased or otherwise acquired Evolving Systems Inc.'s common stock issued in the May 12, 1998, initial public offering (the "IPO class") and all persons who purchased or otherwise acquired Evolving Systems common stock between the date of the IPO and July 23, 1998, inclusive (the "Section 10(b) Class"). The Court has previously granted Plaintiffs' Motion to Certify the Class. Plaintiffs allege violations of §§ 11 and 12 of the Securities Act of 1993 (the "1933 Act") against all Defendants and § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") against Evolving Systems' Defendants and the Outside Director Defendants. Plaintiffs also allege that each of the Individual Defendants is liable under § 15 of the 1933 Act and § 20(a) of the 1934 Act.

Plaintiffs contend that the Company, the Individual Defendants, and the Underwriters, prior to the effective date of the IPO, knew or recklessly disregarded the fact that the Company was experiencing, and had been experiencing, a sharp decline in new business. (Compl.¶ 39.) Plaintiffs contend that Defendants should have discerned this decline from the financial data for the first quarter of 1998. Plaintiffs allege that despite having actual knowledge of, or ready access to, this adverse financial information, Defendants failed to publicly disclose this information either in the Offering Documents or otherwise. (Compl.¶ 39.) Plaintiffs argue Defendants instead chose to release certain hand-picked "nuggets" from the first quarter financial statements. (Compl.¶ 74.) Those hand-picked pieces of information included only favorable gross revenue and net income figures. Because Defendants did not disclose adverse financial information, the statements were materially misleading.

In addition, Plaintiffs allege that the Prospectus contained false and materially misleading statements regarding prepayment penalties associated with the payment of outstanding notes. (Compl.¶ 51.) The Prospectus failed to disclose the amount of the penalties, approximately $500,000, and to whom a substantial portion of the penalties would be payable, namely, defendants Hallenbeck, Fair and Molny.

Plaintiffs also contend that the June 17, 1998 press release was materially false and misleading because the Evolving Defendants knew or recklessly regarded that the Company's stated "explanations" for the projected second quarter earnings were intended to conceal facts that the Evolving Defendants actually knew of Evolving's decline in new business and that the Company's actual financial performance for the second quarter would be even worse than the Company was admitting. (Compl.¶ 58.) In addition, Plaintiffs contend that the timing of the June 17 "preannouncement" was calculated to mislead investors by distracting them from the release of the Company's first quarter financial statements. (Compl.¶ 59.) Plaintiffs also allege that the Company's Class Period financial statements were false. (Compl.¶¶ 65–71).

Further, Plaintiffs allege that the Company and the Individual Defendants acted with scienter in that Defendants knew that the Offering Documents, along with other statements disseminated in the name of the Company, were materially false and misleading. (Compl.¶ 72.) In addition, Plaintiffs contend that as of the May 12 IPO, the Company and the Individual Defendants knew or recklessly disregarded that the Company had experienced a material adverse decline in new contracts. Plaintiffs contend the adverse trend was plainly discernible from the Company's financial statements for the first quarter of 1998, which had ended 42 days prior to the date of the IPO. This adverse financial information was readily available to the Company and the Individual Defendants, confirmed by the fact that the Prospectus itself referenced selected financial data from that statement. (Compl.¶ 73.) Plaintiffs contend that scienter can also be inferred from the fact that the Company and the Individual Defendants chose only to disclose selected, positive financial data from the March 31, 1998 statement

while failing to disclose material adverse information. (Compl. ¶ 74.)

Finally, Plaintiffs contend that the Individual Defendants participated in the dissemination of this fraudulent information in order to inflate the price of Evolving's common stock, thereby enhancing the value of their personal holdings in the stock and allowing for profitable insider sales. (Compl. ¶ 77.)

## B. Defendants' Response

The Defendants deny Plaintiffs' allegations and specifically assert that (1) they were under no duty to release the financial statements for the period ending March 31, 1998, (2) the bespeaks-caution doctrine precludes liability for the prospectus statement, (3) the statements in the June 17, 1998 press release are protected by the Reform Act's Safe Harbor, and (4) Plaintiffs fail to plead specific facts giving rise to a strong inference of scienter.

### Motions to Dismiss

## A. Standard of Review

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is rarely appropriate and should occur only if it appears a plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief. *See Grossman v. Novell, Inc.* 120 F.3d 1112, 1118 (10th Cir.1997). In considering Defendants' motions, the Court must accept as true all the plaintiffs' well-pled factual allegations and view them in a light most favorable to the plaintiff. *See Maez v. Mountain States Tel. & Tel., Inc.,* 54 F.3d 1488, 1496 (10th Cir.1995). Although the fact-specific inquiries common to securities cases generally preclude dismissal, the Court will grant a defendant's 12(b)(6) motion if the alleged misrepresentations or omissions are immaterial or not pled in accordance the Private Securities Litigation Reform Act. *See Grossman,* 120 F.3d at 1118. However, dismissal is not appropriate merely because a Court disbelieves a complaint's factual allegations. *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

## B. Section 10(b) and the Private Securities Litigation Reform Act ("PSLRA")

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 declares it unlawful for a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (1997). To state a valid 10b–5 claim, a plaintiff must allege that the defendant: (1) in connection with the purchase or sale of a security; (2) made an untrue statement of material fact or failed to state a material fact; (3) with scienter; and (4) the plaintiff relied on the misrepresentation and sustained damages as a proximate result of the misrepresentation. *See Anixter v. Home–Stake Prod.,* 77 F.3d 1215, 1225 (10th Cir.1996).

A 10b–5 claim must be pled in accordance with Federal Rule of Civil Procedure 9(b). That rule provides that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) was designed to serve two purposes: (1) to afford a defendant fair notice of a plaintiff's claims and the factual grounds upon which those claims rest, and (2) to safeguard a defendant's reputation from irreparable damage due to improvident charges of wrongdoing. *See Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986–87 (10th Cir.1992).

In 1995, Congress amended the Securities Exchange Act of 1933 and 1934 by enacting the Private Securities Litigation Reform Act. The Reform Act was designed to deter the perceived rise in abusive private securities fraud suits. The Reform Act substantially modified, among other things, the standard for pleading securities fraud claims. Now, to adequately plead a 10b–5 claim, a plaintiff not only must plead with particularity the facts constituting fraud, but also must plead with particularity facts permitting a strong inference that the respective defen-

dant acted with the requisite state of mind. *See* 15 U.S.C. § 78u–4(b)(1) & (2). Thus, there are now two broad inquiries facing a court considering a motion to dismiss a securities fraud claim: first, a defendant may challenge the particularity of allegations regarding the false or misleading statements; and second, a defendant may challenge whether the particularly stated allegations give rise to a strong inference of the required state of mind.

## B. Elements of a § 11 Claim

The pleading requirements of a § 11 claim are less stringent than that of a § 10(b) claim. Section 11 of the 1933 Act imposes strict liability against the issuer of securities where a registration statement contains material misstatements or omits material facts. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Under § 11, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Id.* at 382, 103 S.Ct. 683. Even innocent misrepresentations will subject the issuer of a security to liability. *Id.* There is no scienter requirement for § 11 claims. *Id.* at 381–82, 103 S.Ct. 683. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 200, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

## C. Elements of a § 12(a)(2) Claim

Section 12(a)(2) of the 1933 Act provides that any person who:

> offers or sells a security . . . by means of a Prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him.

15 U.S.C. § 77*l*(a)(2). The purchaser need only allege a material misstatement or omission in a prospectus or oral communication of which he had no actual knowledge. The purchaser need not prove scienter, fraud, or negligence on the part of the seller, nor need he establish that he relied upon the misrepresentation or omission or that his or her loss was a direct or proximate result of the misrepresentation or omission. *See, e.g., MidAmerica Fed. Sav. and Loan Assoc. v. Shearson/American Express Inc.,* 886 F.2d 1249, 1256–57 (10th Cir.1989). Section 12(a)(2) differs from § 11 in that the only class of defendants who may be subject to liability are those who "offer or sell" unregistered securities. *Pinter v. Dahl,* 486 U.S. 622, 641, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

## *Analysis*

### A. Plaintiffs' § 11 and Claims Against All Defendants

#### 1. Omissions regarding the March 1998 Financial Statement

The heart of Plaintiffs' Complaint is that defendants, in the Offering Documents, falsely represented that the Company was a "leader" in the provision of LNP products and selectively picked earnings and revenue figures from the Company's first quarter financial results to deceive investors into believing that its 1997 growth had continued into the first quarter of 1998, when in fact, the Company had suffered a severe drop in new business in the first quarter of 1998. (Pl.Mem.Opp.Def.Mot. Dismiss at 16.) Plaintiffs allege that: (1) the Company suffered a sharp decline in new business in the first quarter of 1998, (¶¶ 5, 39), (2) that data confirming the decline in first quarter new business was available to all defendants as of the May 12 Offering Date (¶¶ 7, 73), and (3) that the Prospectus contained no disclosure of the sharp decline in first quarter new business. (¶¶ 6, 39, 42–49.)

According to § 11, the Court first must determine if the Company allegedly made any material representations or omissions. Plaintiffs allege that the Prospectus omitted information regarding the decline in first quarter new business. Such information would be material if "a reasonable person would consider it important in determining whether to buy or sell stock."

*Grossman*, 120 F.3d at 1119.[2] An omission would be material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

■ Defendants, however, argue that (1) they had no duty to disclose the first quarter financial information, and (2) any misleading statements were neutralized by the bespeaks caution doctrine. Defendants are correct that under Article 3 of SEC Regulation S–X, the Company's first quarter financial statements were not required to be disclosed because they did not address a fiscal period commencing more than 135 days prior to the offering. However, Defendants voluntarily chose to release partial information from those financial statements relating to increases in revenue and net income. As one would expect, those statements reflected positively on the Company's first three months of 1998.[3] Defendants failed to reveal, however, the decline in the Company's new business or any other information from which an investor could determine that the Company's new business had suffered a major downturn. (Compl. ¶ 49.)

■ This Court finds that under *Grossman*, any reasonable person would have found the decline in the Company's new business important in determining whether to buy or sell stock. The omission is thus material and arguably should have been released. And although Defendant had no affirmative duty under SEC Regulation S–X to disclose its entire first quarter financial statement, the Defendant nevertheless chose to release selective positive information from those statements while withholding allegedly negative information. The favorable revenue and net income figures are allegedly misleading when set apart from the figures related to the downturn in new business. True, Defendants had no duty to disclose according to Regulation S–X, but when they chose to release selected, positive information from the first quarter statements, they should have revealed the potentially negative information as well. *See, e.g., Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir.1994) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything").

■ In addition to Defendants' arguments regarding SEC Regulation S–X, Defendants also argue that their cautionary warnings concerning the potential risks involved in the Company's business were sufficient to immunize them from liability under the "bespeaks caution" doctrine. The bespeaks caution doctrine stands for the "'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." *Grossman*, 120 F.3d at 1120 (quoting *Rubinstein*, 20 F.3d at 167). However, the bespeaks caution doctrine applies only to affirmative, forward-looking statements. *Grossman* 120 F.3d at 1123. The doctrine does not apply to misleading statements concerning "present factual conditions." *Id.*

The allegedly misleading statements regarding the Company's 1998 first quarter revenue and net income are "present factual conditions." Even though some Plaintiffs may have relied on the statement as an indicator of future success, the nature of the statement remains constant. The statement concerned a present, factual event, not a prediction of future success. The bespeaks caution doctrine simply does not apply to Defendants' partial disclosure of the March 1998 financial statement.

Consequently, the Court finds that Plaintiffs have established a prima facie case under § 11 of the 1933 Act with regard to the allegedly material omissions of the March

---

**2.** Although *Grossman* addresses a 10b–5 claim, the Court finds its definition of materiality applicable to § 11 and § 12(a)(2) claims as well.

**3.** Specifically, defendants represented that:
The Company's unaudited results of operations for the three months ended March 31, 1998,

reflect an increase in revenue of 63% to $13.1 million from $8.1 million for the three months ended March 31, 1998 and an increase in net income to $440,000, from a net loss of $191,-000 for the three months ended March 31, 1998.
Prospectus at 5.

1998 financial statement. Defendants' Motions to Dismiss on this issue are **DENIED.**

### 2. Prepayment Penalties

█ Plaintiffs also contend that the Prospectus failed to make an adequate disclosure regarding certain prepayment penalties. Specifically, Plaintiff argues that although the Prospectus disclosed the existence of certain prepayment penalties, it failed to disclose the amount of the penalties, approximately $500,000, and to whom the penalties were payable, to Defendants Hallenbeck, Fair and Molny. The pertinent statements are as follows:

> The Company intends to use the net proceeds of this offering primarily for repayment of its obligations under the Subordinated Notes and Stockholder Notes (as defined herein), working capital and other general corporate purposes. The respective principal amounts (exclusive of $56,517 in accrued interest) outstanding under the Subordinated Notes and the Stockholder Notes are $6,792,885 and $5,092,859 and bear interest at the rates of 9% (with deferred interest accrued at the rate of 12%) and 7.25%, respectively, with maturity dates of June 1, 2004 and January 2, 2006.

Prospectus at 19.

> On January 2, 1996, the Company distributed substantially all previously undistributed earnings on which stockholders had been taxed in the form of stockholder notes payable (the Notes), aggregating $6,683,625. These Notes are unsecured and are due January 2, 2006, with interest payable annually on December 31 at 7.25% per annum, and contain prepayment penalties.

Prospectus at F–12.

First, the Court finds that there was an omission. Although Defendants revealed the existence of prepayment penalties, Defendants did not disclose the amount of prepayment penalties. Second, the Court finds that the omission was material under *Grossman*, i.e., investors would have based a decision to invest on such information. The prepayment penalties in this instance appear to have been more than 1% of the roughly $42 million in total proceeds that the Company expected to raise in the offering. Such an amount is not trivial and could certainly be considered material. Consequently, Defendants' Motions to Dismiss on this issue are **DENIED.**

### B. Plaintiffs' Section 12(a)(2) Claims against all Defendants

█ Section 12(a)(2) of the Securities Act of 1933 provides that a person who "offers or sells" newly issued securities "by means of a prospectus" that misrepresents or omits a material fact is "liable to the person purchasing such security from him." Securities Act of 1933 § 12(a)(2), 15 U.S.C. § 77*l* (1981). A "prospectus" is a "document soliciting the public to acquire securities." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The Tenth Circuit has recognized that according to *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), § 12(a)(1) liability is not "limited to the person who passes title to the securities, but extends 'to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir.1998). Thus, the Pinter court did not adopt a restrictive, literal meaning of "seller," but held that a "seller" did not necessarily have to be the "owner" of the securities. Although Plaintiffs have brought their claim under § 12(a)(2), the Tenth Circuit has also observed that "*Pinter's* definition of a statutory seller under § 12(a)(1) has been applied to § 12(a)(2) as well." *Maher*, 144 F.3d at 1307 n. 10 (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 637 (3d Cir.1989)).

As to the Underwriters in the instant action, there is no question that they were "direct" sellers of Evolving System's stock and clearly fall under the auspices of § 12(a)(2). The Registration Statement makes clear that Evolving entered into a "firm commitment" underwriting, in which all of the offered shares were purchased from Evolving by the underwriters and were, in turn, sold to the public. (Rose Decl.Ex. 3 at U–1.) The underwriters are thus liable both under § 11 and § 12(a)(2).

█ However, Plaintiffs can also make a prima facie case against the remaining defen-

dants, if they "at a minimum allege facts" that the defendants "solicited" the purchase of their Evolving Systems stock. *Maher,* 144 F.3d at 1307. This they have done. Plaintiffs allege that the Company and the Individual Defendants had a financial interest in soliciting sales (¶¶ 7, 77–78), that each Individual Defendant signed the Registration Statement (¶ 19), and that three Individual Defendants (Hallenbeck, Fair, and Molny) each sold stock as part of the IPO (¶ 20). Thus, Plaintiffs have alleged that the remaining defendants "solicited" the sale of stock, motivated "at least in part by a desire to serve his own financial interests." *See Craftmatic,* 890 F.2d at 637 (simple allegation that defendants "either sold or promoted the sale of . . . securities directly to plaintiffs" and "were motivated by a desire to serve their own financial interests" sufficient to withstand motion to dismiss). Consequently, all Defendants were "sellers" according to § 12(a)(2).

This analysis, combined with the Court's analysis of Plaintiffs' § 11 claims, shows that Plaintiffs have established a prima facie case under § 12(a)(2) as well. Consequently, all the defendants' Motions to Dismiss Plaintiffs' § 12(a)(2) claims are **DENIED.**

## C. Plaintiffs' 10(b) Claims against Evolving Systems and the Individual Defendants

In addition to § 11 and § 12(a)(2) claims, Plaintiffs bring a securities fraud claim under § 10(b) of the 1934 Act and accompanying Rule 10b–5. The pleading requirements for this claim are strict. Allegations must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. In addition, Plaintiffs' allegations must give rise to a strong inference of Defendants' required state of mind.

### 1. Particularity of Material False and Misleading Statements or Omissions

■ The Reform Act requires a plaintiff's complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). If the complaint is pled on information and belief, it must "state with particularity all facts on which that be-

lief is formed." *Id.* Because § 78u–4(b)(1) appears in large part to be merely a codification of pre-existing Tenth Circuit law on Federal Rule of Civil Procedure 9(b), the Court will consider pre-Reform Act decisions from the Tenth Circuit in determining whether Plaintiffs' Consolidated Complaint is pled with sufficient particularity. *See, e.g., Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.,* 2 F .Supp.2d 1345, 1353 (D.Colo.1998).

■ The Court finds Plaintiffs' allegations, as set forth above, sufficiently particular to satisfy Rule 9(b) and the Reform Act. While some of the allegations may be classified as mere puffing or inactionable statements of corporate optimism, others–such as those regarding the absence of information regarding the March 1998 financial statement and the failure to disclose the amount of prepayment penalties–are capable of independent verification. These two allegations specify the exact substance of the representations made, the medium through which the representations were made, the date on which they were made, and the particular reasons why the statements were either false or misleading at the time they were made. Neither Rule 9(b) nor the Reform Act requires that Plaintiffs do more. *See Powers v. Eichen,* 977 F.Supp. 1031, 1037–38 (S.D.Cal. 1997) (complaint satisfies alleged misstatement and gives reasons why statement was misleading).

### 2. Scienter

The Reform Act requires that "the complaint, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Court must determine what state of mind is required and what type of pleaded facts will give rise to a "strong inference" of the required scienter.

#### (a) State of Mind

The required state of mind is dependent upon the type of statement made by the defendants. Statements that satisfy the statutory definition of "forward-looking" are

subject to the Reform Act's safe harbor provision. A "forward-looking" statement includes any statement containing a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items; any statement of the plans and objectives of management for future operations; and any statement of future economic performance. *See* 15 U.S.C. § 78u–5(i)(1). The safe harbor explicitly excludes from protection forward-looking statements included in financial statements prepared in accordance with GAAP, statements contained in registration statements, or statements made in connection with a tender offer or initial public offering. *See* 15 U.S.C. § 78u–5(b)(2).

■■■■ The safe harbor provision, like the "bespeaks caution" doctrine discussed earlier, insulates a defendant from liability for forward-looking statements if the statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u–5(c)(1)(A). In addition, the safe harbor protects forward-looking statements not accompanied by sufficient cautionary statements by imposing upon Plaintiffs a higher scienter standard. Section 78u–5(c)(1)(B) provides that a forward-looking statement, written or oral, may not be the basis for liability unless the plaintiff proves the statement "was made with actual knowledge ... that it was false or misleading." The Reform Act does not specify what state of mind is required with respect to non-forward looking statements, but usually knowing or reckless behavior will suffice. The Tenth Circuit has defined this type of reckless behavior as conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it."

*O'Connor v. R.F. Lafferty & Co., Inc.,* 965 F.2d 893, 899 (10th Cir.1992).

■■■ Not surprisingly, the parties are in disagreement over which, if any, of the defendants' statements are forward-looking. Specifically, the Evolving defendants contend that the June 17 pre-announcement of second quarter results was forward-looking. In addition, Defendants contend the June 17 press ·release is eligible for Safe Harbor protection because it provided meaningful cautionary statements identifying important factors that could cause actual performance to vary.[4]

The Court finds that Defendants' June 17 press release is a forward-looking statement insofar as it speculates about a decline in second quarter earnings. In addition, the· statement is accompanied by sufficiently specific cautionary language.

Nevertheless, the Court finds that the June 17 press release does not fall within the PSLRA's safe harbor provision. Plaintiffs correctly argue that the safe harbor provision provides no refuge for Defendants who make statements with "actual knowledge" of their falsity. Plaintiffs allege that Defendants, based upon the first-quarter decline in new business, knew that second-quarter earnings would be much worse than they reported. Plaintiffs also allege that the circumstances of the issuance of the June 17 press release were suspicious and calculated to distract attention from its first quarter financial statement, which was not released until the following week. (Compl.¶ 76.)

The Court finds that these allegations, taken as true, create a sufficient inference that Defendants acted with "actual knowledge" that the June 17 press release was false. Thus, the Court will not dismiss Plaintiffs' claim on this issue at this stage of litigation.

4. The statement provided:
Actual results could differ materially from those currently anticipated as a result of a number of factors, risks and uncertainty. Risk factors that should be considered in evaluating the Company and its business for investment purposes include, but are not limited to: the magnitude and timing of future contracts; the Company's rate of progress under such contracts; the timing of ... anticipated changes in laws and regulations affecting the telecommunications industry ... and competition by existing and emerging competitors in the telecommunications software markets.
(Rose Decl.Ex. 2 at 2.) ·

**(b) Strong Inference**

██ The Reform Act requires that Plaintiffs "plead with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). However, the Act does not give a good definition of "strong inference." The Second Circuit believed a strong inference was raised when a plaintiff alleged: (1) facts showing that the defendants had both motive and opportunity to commit fraud; or (2) facts constituting strong circumstantial evidence of reckless or conscious behavior. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris*, 75 F.3d 801, 813 (2d Cir.1996). However, as consistent with its earlier rulings, this Court assumes that the Reform Act requires that "a court examine a plaintiff's allegations in their entirety, without regard to whether those allegations fall within a formalistic category such as motive and opportunity, to determine if the allegations permit a strong inference of fraudulent intent." *See Queen Uno*, 2 F.Supp.2d at 1359.

**(i) The Director Defendants**

██ The Plaintiffs allege that the Director Defendants, having signed the prospectus, are responsible for its contents and any misrepresentations contained within. The Director Defendants argue that the Complaint fails the scienter requirement because it makes no distinctions as to one defendant's state of mind *vis a vis* another's state of mind. The Outside Director Defendants also argue that they are not responsible for the prospectus because the group-published information does not apply to them in the wake of the PSLRA.

According to the Tenth Circuit, "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions

of corporate directors or officers." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir.1997). In addition, the *Celestial* court noted that "prospectuses, registration statements, annual reports, press releases, or other 'group published information' are presumed collective actions." *Id.* (quoting *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987)). All the Director Defendants were alleged to have signed the Prospectus. And according to *Celestial*, the Director Defendants would be responsible for the June 17 press release, since it was a group published document.[5] The Complaint identifies the Director Defendants it alleges are responsible for Evolving's statements, (¶¶ 19, 22, 23), and Plaintiffs have adequately pled with particularity that certain statements made by the Company were allegedly fraudulent. Although these allegations do not separate which defendants are responsible for which statements, the complaint appears to satisfy the requirements of the *Celestial* court.[6]

Consequently, Plaintiffs' claims against the Director Defendants will not be dismissed at this time. The Evolving Defendants' and Outside Director Defendants' Motions to Dismiss Plaintiffs' 10(b) claim are thus **DENIED.**

**D. Other Claims**

**1. Controlling Person**

██ Plaintiffs also allege that each of the Individual Defendants is liable as a controlling person of the company under § 15 of the 1933 Act and § 20(a) of the 1934 Act. To state a claim for controlling person liability, plaintiffs need only allege a primary violation of the underlying federal securities statute and "control" by the alleged controlling person. *First Interstate Bank of Denver, N.A. v. Pring*, 969 F.2d 891, 898 (10th Cir.1992), *rev'd on other grounds*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Because

---

**5.** Although the *Celestial* court interpreted Rule 9(b) and not the PSLRA, this Court has already determined that there was little, if any, difference between the Tenth Circuit's pleading standards under 9(b) and the standards established by the PSLRA. Consequently, the reasoning behind *Celestial* can easily be applied to the current case governed by the PSLRA.

**6.** In addition, the Complaint alleges that the Individual Defendants had motive (to increase the value of their stock) and opportunity (access to financial data) to commit fraud. These allegations also contribute to the inference that Defendants acted with scienter.

Plaintiffs have pled the existence of an underlying primary violation under § 11 and § 12(a)(2) of the 1933 Act and § 10(b) of the 1934 Act, their controlling person claims also stand. Defendants' Motion to Dismiss this claim is thus **DENIED**.

### 2. Evolving's Allegedly False Financial Statements

Plaintiffs allege that Evolving's Class Period financial statements were false. The Reform Act requires, at a minimum, that plaintiffs plead with particularity the reasons why the challenged statements, including financial statements, were false when made. *Queen Uno*, 2 F.Supp.2d at 1359. Plaintiffs have failed to do so. Plaintiffs allegations are vague and do not identify, for example, which fiscal period's results were overstated or the amount by which the results were overstated. (Compl.¶ 68.) The Complaint also alleges that the Company's internal controls were inadequate, but does not identify the allegedly defective controls. (Compl.¶ 68.) Plaintiffs allegations do not contain the requisite detail to survive a motion to dismiss. Consequently, the Evolving Defendants' Motion to Dismiss this claim is **GRANTED** and Plaintiff's claim on this issue is **DISMISSED WITH PREJUDICE**.

### *CONCLUSION*

For the foregoing reasons, the Court **ORDERS** that Defendants' Motions to Dismiss are **DENIED** in part and **GRANTED** in part. Specifically, all Defendants' Motions to dismiss relating to the § 11 and § 12(a)(2) claims are **DENIED**. The Evolving Defendants' and the Outside Director's Motions to Dismiss regarding Plaintiffs' § 10(b) claim are also **DENIED**. The Evolving Defendants' and Outside Directors' Motions to Dismiss regarding Plaintiffs' § 15 and § 20(a) claims are **DENIED**. The Evolving Defendants' Motion to Dismiss Plaintiffs' claim alleging that Evolving's Class Period financial statements were false is **GRANTED**.