**Dale HACKBART and Holmes Tire of Denver, Inc., a Colorado corporation, by Dale Hackbart as Shareholder, Plaintiffs-Appellees,**

v.

**James F. HOLMES, Defendant-Appellant.**

**No. 80–1368.**

United States Court of Appeals,
Tenth Circuit.

April 19, 1982.

William D. Meyer of Hutchinson, Black, Hill, Buchanan & Cook, Boulder, Colo., for defendant-appellant.

Bruce O. Downsbrough of Williams, Trine, Greenstein & Griffith, Boulder, Colo., for plaintiffs-appellees.

Before BARRETT and LOGAN, Circuit Judges, and CHILSON,* District Judge.

* Honorable Hatfield Chilson, United States District Judge for the District of Colorado, sitting by designation.

**1116**

LOGAN, Circuit Judge.

■ In this Rule 10b–5 securities fraud action, defendant James F. Holmes appeals the trial court's decision that in selling to plaintiff Dale Hackbart preferred stock in their two-owner tire sales company, Holmes acted recklessly by failing to ensure that Hackbart understood the preferred stock would not share in the growth of the corporation unless and until Holmes permitted it to be converted to common stock. The trial court found this duty to assure Hackbart's understanding arose for three reasons: (1) because Holmes had previously promised Hackbart an equal, or nearly equal, share in ownership of the new corporation in exchange for Hackbart's cash contribution and his commitment to manage the company; (2) because Holmes was a longtime friend of Hackbart and knew Hackbart was relying on Holmes's business expertise in organizing the new corporation; and (3) because Holmes knew Hackbart was inexperienced in business affairs and should have known Hackbart might not understand that preferred stock with a stated liquidation value does not share in the growth of the corporation.[1]

Hackbart and Holmes had been friends since the late 1950s when they were football teammates at the University of Wisconsin. After graduation Hackbart went on to play professional football and Holmes commenced work in his family's tire business in Wisconsin. Over the years they and their families remained in contact with each other, and even took occasional trips together.

In October 1971 Holmes purchased a tire business in Longmont, Colorado, which he incorporated as Holmes Tire of Colorado, Inc., and a small warehousing business in Denver, which, with Hackbart, he later incorporated as Holmes Tire of Denver, Inc. and operated as a branch of the Longmont business.[2] Knowing that Hackbart's football career was near its end, Holmes discussed with Hackbart whether he wanted to participate in the Denver venture. The trial court found that during their discussions, Holmes offered Hackbart an equal partnership, but later insisted on a 51% share so that Holmes could maintain control. Holmes said he would have a lawyer draw up papers to reflect their agreement. But when Holmes spoke with his attorney, the lawyer suggested a "trial period" since Holmes had never previously worked with Hackbart and Hackbart had no experience in the tire industry. Holmes agreed with his attorney's proposal that Hackbart be issued preferred stock in Holmes Tire of Denver, Inc. which would not share in the corporate growth until the board of directors, controlled by Holmes, converted it to common stock upon Hackbart's work proving to be satisfactory. Knowing that Hackbart intended to meet with Holmes's attorney, Holmes relied on the lawyer to explain to Hackbart the ownership arrangement. Although we subsequently discuss the details of Hackbart's conversation with the attorney, we note here the trial court's conclusion that Hackbart, whom the court described as naive as to business matters, left the attorney's office with "no understanding" of the change in plans.

---

1. Throughout this litigation all parties have assumed that Hackbart's stock did not share in the corporation's equity growth. Preferred stock may be "participating" or "nonparticipating" in a company's equity growth. The articles of incorporation should expressly address this issue, see Colo.Rev.Stat. § 7–2–102(e); H. Henn, *Law of Corporations* § 124, at 210 (1970). When as here the articles are silent, the general rule is that upon corporate dissolution, preferred shareholders are entitled to no more than the liquidation preference stated in the articles, with the holders of common stock entitled to the rest of the corporate assets. *See Cannon v. Denver Tramway Corp.*, 373 A.2d

580, 581–82 (Del.Ch.1977). There is some authority to the contrary, however. H. Henn, *Law of Corporations* § 382, at 819 (1970).

2. Holmes later added two more stores. As the business was eventually organized, he managed the parent facility at Longmont, with store managers in charge of branches in Denver, Fort Collins, and Greeley. Hackbart was manager of the Denver operation, the only one that sold wholesale, rather than both wholesale and retail. The branches purchased their tire stock and leased their equipment and vehicles from the parent company. The parent company also sold tires.

Hackbart and Holmes each contributed $5,000 to the venture. The corporation prospered, but when the two owners had a falling out in February 1977, they agreed Hackbart should leave the business. Hackbart then requested "his share" of the corporation, but Holmes told him he held only preferred stock that did not participate in the company's growth and was entitled only to the $5,000 he had contributed. This suit followed.

■ The trial court found that in selling the preferred stock to Hackbart, Holmes had violated Rule 10b–5's proscription against use of a "manipulative or deceptive device or contrivance." Concluding that recklessness satisfies the scienter requirement, the court found that Holmes had acted recklessly in not assuring Hackbart's understanding of the "new terms" of the deal. The court also concluded that Hackbart's claim was not barred by the statute of limitations. It calculated damages based on the value of a 49% share of the company as of February 1977, the date the parties severed their relationship. Holmes appeals each of these findings.[3]

I

*Reckless Conduct as Meeting The Scienter Requirement*

Holmes contends that at least under the circumstances of this case—the failure of a seller of securities to ensure that the buyer understands the security's limitations—a recklessness standard is too low, and that 10b–5's scienter requirement should be considered satisfied only by a finding that Holmes *intended* to deceive Hackbart. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that liability under Rule 10b–5 requires a finding of scienter, defining scienter as "a mental state em-

bracing intent to deceive, manipulate, or defraud." *Id.* at 193 & n.12, 96 S.Ct. at 1380 & n.12. The Court declined to decide whether reckless behavior is sufficient for liability, but concluded that negligent conduct is not. *Id.* at 193 n.12, 96 S.Ct. at 1380 n.12.

Circuits subsequently addressing the question all have concluded that reckless behavior satisfies the scienter requirement. *See G. A. Thompson & Co. v. Partridge*, 636 F.2d 945, 961–62 (5th Cir. 1981) (though terming the mental state "severe recklessness"); *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir. 1979); *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44 (2d Cir.) (sufficient at least when fiduciary duty is owed), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1039–40 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

■■ This Circuit at least implicitly has concluded that recklessness is enough. *See Wertheim & Co. v. Codding Embryological Sciences, Inc.*, 620 F.2d 764, 766–67 (10th Cir. 1980); *Cronin v. Midwestern Okla. Dev. Auth.*, 619 F.2d 856, 862 (10th Cir. 1980); *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 596 (10th Cir. 1979). At this time we expressly hold that recklessness satisfies the scienter requirement. We do so for the same reasons given by the other circuits: first, because the Securities Acts are to be broadly construed to achieve their remedial goals, *Mansbach*, 598 F.2d at 1024 (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1470, 31 L.Ed.2d

---

**3.** Holmes does not appeal the issue of federal court jurisdiction. Even though Holmes and Hackbart were the only stockholders, and the company's total capitalization was only $10,-000, the trial court found jurisdiction because Hackbart invested in response to representations Holmes had made over interstate phone lines and during interstate visits. *See* 15

U.S.C. § 78j; *Kerbs v. Fall River Indus.*, 502 F.2d 731, 737 (10th Cir. 1974). We agree with the trial court that although this type of injury seems better treated as a common law fraud or a breach of contract action, *see Holdsworth v. Strong*, 545 F.2d 687, 699 (10th Cir. 1976), it nonetheless falls within the broad coverage of the federal securities laws.

741 (1972)); second, because requiring the plaintiff to show intent would be unduly burdensome, *Thompson*, 636 F.2d at 961 n.32; *Mansbach*, 598 F.2d at 1025; *Rolf*, 570 F.2d at 47; and third, because the Securities Acts were intended to proscribe actions akin to common law fraud, *see Hochfelder*, 425 U.S. at 212 n.32, 96 S.Ct. at 1390 n.32 (reviewing legislative history and finding that the SEC believed the rule would proscribe fraudulent behavior), and reckless behavior satisfies the scienter requirement of common law fraud, *Mansbach*, 598 F.2d at 1024. For purposes of applying Rule 10b-5, the best definition of reckless behavior is conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp.*, 553 F.2d at 1045 (quoting *Franke v. Midwestern Okla. Dev. Auth.*, 428 F.Supp. 719, 725 (W.D.Okl.1976)).

## II

### Sufficiency of the Evidence of Recklessness

■ The trial court found that Holmes did not intend to deceive Hackbart, but that Holmes acted recklessly in not making sure Hackbart understood he was not going to participate in the growth of the corporation. The trial court's factual finding of recklessness is governed by the clearly erroneous standard. *See, e.g., Mansbach*, 598 F.2d at 1025; *Rolf*, 570 F.2d at 43–44; *cf. TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (materiality of omission is matter of law only if reasonable minds could not differ).

The trial court concluded that Holmes and Hackbart initially intended to share the ownership on a 50%–50% basis, and then on a 51%–49% basis. Substantial evidence supports this finding: Hackbart testified that this was what Holmes had told him; Holmes said he had offered to "form a company" with Hackbart, and it was his intention to share the ownership so long as Hackbart worked diligently and the corporation succeeded; Holmes insisted that he own 51% of the stock "to maintain control"; and Hackbart and Holmes contributed equal amounts of cash.[4]

When Holmes spoke with his attorney, he decided to change the deal, and so, instead of common stock, issued Hackbart preferred stock that could be converted to common only "at the discretion of the Board of Directors," which Holmes controlled. Holmes relied on his attorney to explain the change to Hackbart and said nothing about it to Hackbart. The court accepted the attorney's testimony that he had told Hackbart he was being issued nonvoting preferred stock. The attorney also testified that he had informed Hackbart his preferred stock would not share in the growth until converted by the board of directors after a "trial period"; but the court questioned the attorney's ability to remember the details of a conversation that had taken place seven years earlier. The trial court found the attorney had inadequately explained the nature of the stock Hackbart was going to receive: even if the attorney's recollection was accurate the explanation was technical, was supported by conflicting and inadequate references in the corporate documents, and did not bring home to Hackbart that the plans had been changed.

Nothing in the record indicates that the attorney explicitly told Hackbart that the preferred stock would be "nonparticipating." The attorney testified that like any other shareholder, Hackbart could learn of

---

4. Holmes contends that Hackbart previously had quit several jobs after only short periods of time, so he made Hackbart contribute $5,000 to encourage a commitment to the new company. However, the record does not show that Holmes explained the contribution to Hackbart in those terms. Because Holmes made an equal cash contribution of $5,000, had offered

to form a company with Hackbart, had told him, without being more specific that both were going to be issued stock, and had given him no contrary explanation for the equal cash contribution, Hackbart reasonably could assume they were going to be partners on approximately equal footing.

the stock's attributes by reviewing the articles of incorporation. Hackbart testified he did not examine the articles or other corporate documents; but even if we charge him with knowledge of them, they are sketchy, incomplete, and confusing. The articles' description of the attributes of preferred stock is inadequate and fails to comply with Colorado law, which requires the articles to contain "a statement of the preferences, limitations, and relative rights with respect to the shares of each class." Colo.Rev.Stat. § 7–2–102(e). The articles state only that a share of preferred stock is nonvoting, "with a par and liquidation value of $25.00 per share, each convertible into one share of common stock at the discretion of the Board of Directors."

Neither the articles nor any of the other corporate documents address dividend rights because, according to the attorney's testimony, he assumed the corporation would not declare dividends. Yet dividends are the principal means whereby shareholders participate in the growth of a successful corporation. If the articles said no dividends would be declared or the preferred stock would not participate in dividends, Hackbart might have been placed on notice that he would not participate in growth of the corporation.

The corporate documents also are silent as to redemption, and generally neither a shareholder nor the corporation has the right to force redemption unless the articles specifically grant that right. *See id.* § 7–6–103. Yet the attorney testified that the liquidation value statement "is the redemption provision for the preferred stock," evidently assuming that by voluntarily dissolving the corporation, the board of directors could force Hackbart to surrender his stock at $25 per share. Under Holmes's and his attorney's view, because they had agreed the corporation would not pay dividends,

for an uncertain period of time Hackbart's contribution would be nothing more than a no-interest loan to the corporation, even if the corporation was very successful, a fact they hardly brought home to Hackbart.

The trial court properly focused on other examples of confusion produced by the corporate documents. Though the articles permit the board of directors at its discretion to convert preferred stock to common stock, they do not specify whether following approval by the board conversion is mandatory or at the shareholder's option. Hackbart's stock certificate states only that the corporation has authorized 980 shares of $25 par value preferred stock, and that Hackbart is the owner of 196 *common shares*, with par value of $25. The trial judge accepted the attorney's testimony that the reference to common shares was a clerical error,[5] but it could have reinforced Hackbart's belief that he was owner of nearly half the company. Like the articles of incorporation, the share certificates do not explain the rights of the stock, and do not comply with Colorado law, which requires that they set forth "a full statement of the designations, preferences, limitations, and relative rights of the shares of each class [of stock] to be issued ..." *Id.* § 7–4–108(2). The statutory requirement no doubt is aimed at avoiding shareholder misunderstandings.

Additionally, the bylaws, which make no reference to preferred stock, provide a means of valuing stock the shareholders transfer to outsiders; the valuation varies with the corporation's net worth, which suggests Hackbart's stock will be valued in that manner. Also, the first financial statement issued for the corporation, for the period ended July 31, 1972, showed 400 shares of common stock as the sole outstanding stock. Though this was corrected on later financial statements, Hackbart tes-

---

**5.** The attorney initially prepared and sent Holmes stock certificates that showed Hackbart owned 980 shares of preferred stock and Holmes owned 1020 shares of common stock. The record does not show whether Hackbart received his certificate. A month later the attorney issued new certificates that read 196 shares for Hackbart and 204 shares for Holmes, but on Hackbart's certificate the preprinted word "common" was not changed to "preferred." The attorney also sent the originals of these certificates to Holmes. Hackbart testified that while he was not given his stock certificate, Holmes did show it to him.

tified that Holmes had showed him the first financial statement, had commented that the company was making money, and, pointing to the stockholders' equity section, had told him that his share of the company had increased in value.[6]

Thus the documents did not give Hackbart adequate notice that for some indefinite period of time he would not share in the company's equity growth. The record also supports the trial court's finding that the attorney inadequately explained the rights accompanying Hackbart's $5,000 contribution and, more importantly, the extent to which the plans had been changed from Hackbart's earlier conversations with Holmes.

■ We must determine whether Holmes's behavior presented such an obvious danger of misleading Hackbart that Holmes must have been aware of it. We find sufficient evidence to support the trial court's conclusion that Holmes did act recklessly. In particular, Holmes knew Hackbart expected to share in the ownership, yet he failed to say anything to Hackbart about the change in plans. Holmes had told Hackbart that they were both going to receive stock and that Holmes would have a controlling interest. Neither during preliminary discussions nor during the years they were working together did Holmes mention to Hackbart the words "preferred stock." Holmes did not even ask Hackbart what the attorney had told him. He knew that Hackbart was naive in business matters,[7] but he made no effort to ascertain that Hackbart understood the significance of preferred stock with a fixed liquidation value.[8] Nor did Holmes verify that the corporate documents correctly described the shareholder rights. We cannot say that the trial court's finding of recklessness was clearly erroneous.

## III

### The Statute of Limitations

■ Rule 10b–5 suits are subject to the appropriate limitations statute of the state in which the alleged violation occurred. *E.g., Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1041 (10th Cir. 1980). The parties have agreed that the Colorado statute of limitations for fraud applies here; it requires commencement of the suit within three years from the date the fraud was committed. Colo.Rev.Stat. §§ 13–80–108 to –109. Although whether Colorado or federal law governs the tolling of the statute is not entirely clear, *see Aldrich,* 627 F.2d at 1041, under both Colorado and federal law the limitations period is tolled until the aggrieved party learns of the fraud or should have discovered it by the exercise of reasonable diligence. *Id.* As we have said previously,

> "[T]he duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings."

*deHaas v. Empire Petroleum Co.,* 435 F.2d 1223, 1226 (10th Cir. 1970) (quoting *Tobacco*

---

**6.** If true, this statement suggests either that Holmes was deliberately deceiving Hackbart or, more likely, that Holmes too thought Hackbart was part owner of the corporation. *See* note 8 *infra.*

**7.** Holmes had testified that one reason he insisted on controlling the corporation was that Hackbart did not "know anything about business." R. IV, 387, 390. Although Hackbart was a college graduate who previously had invested in the stock market, this does not mean he necessarily understood the basics of corporate ownership.

**8.** Some evidence in the record suggests that Holmes believed Hackbart had an equitable interest in the corporation. *See* note 6 *supra.* Martin Plaster, who was Holmes's accountant and termed by the trial judge the "most objective, credible witness," testified that just after Holmes and Hackbart parted ways, Holmes told Plaster that Hackbart "didn't know what [ownership interest] he had," and that "[i]f he wanted to see how valuable [his ownership interest] was, watch it go down," apparently referring to lessening the value of the corporation by rerouting customers through other Holmes companies.

*and Allied Stocks, Inc. v. Transamerica Corp.*, 143 F.Supp. 323, 331 (D.Del.1956)).

Holmes contends that if Hackbart had exercised reasonable diligence he would have learned the nature of his ownership interest at the time he purchased it, in February 1972, and therefore the limitations period ran three years later, well before Hackbart brought this action in December 1977. The trial court found that Hackbart did not learn that his ownership interest did not participate in the equity growth until February 1977 when Holmes and Hackbart terminated their relationship. Because in assessing damages, the court valued the corporation as of the date Hackbart knew or should have known of the deception, and used for that date February 1977, it implicitly concluded that even if Hackbart had exercised reasonable diligence, he would not have learned the true nature of affairs until that time. Substantial evidence supports that factual finding. Hackbart testified that he took the company's first financial statement to an accountant. The accountant reviewed with Hackbart the stockholders' equity section, which stated that the company had 400 shares of stock outstanding and that they were all common stock. According to Hackbart, the accountant told him that the company had shown a net profit for the period and that the value of his stockholders' equity had increased. As previously mentioned, Holmes knew that Hackbart expected to share in the ownership of the company, was naive, and was relying on Holmes's expertise in establishing the corporation. Yet Holmes made no effort to inform Hackbart that the deal had been radically changed. Nor was Hackbart adequately informed by either the attorney's explanations or the corporation documents. Under the circumstances of this case, we cannot say that the trial court's implicit finding as to the commencement of the limitations period was clearly erroneous.[9]

## IV

### Damages

Holmes contends that the trial court improperly used a "benefit-of-the-bargain" measure of damages in giving Hackbart 49% of the value of the company as of the date the parties had a falling out and Hackbart learned his ownership interest was not what he had thought. Holmes argues the court should have used the "out-of-pocket loss" measure customarily used in securities fraud cases and therefore should have limited Hackbart's damages to the $5,000 he paid, leaving Holmes with the remaining value of the corporation, a value enhanced because of his and Hackbart's efforts.

The customary measure of damages in a Rule 10b–5 case is the out-of-pocket loss. *See, e.g., Estate Counseling Serv., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527, 533 (10th Cir. 1962). But cases also support the trial court's fashioning of a remedy to suit the particular case. *See, e.g., Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1198 (8th Cir. 1978); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 104–05 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); *cf. Osofsky v. Zipf*, 645 F.2d 107 (2d Cir. 1981) (violation of section 28(a) of the 1934 Act). Additionally, the trial court's award of damages can be justified as the measure of Hackbart's out-of-pocket loss: Hackbart gave up not only his $5,000 investment, but

9. Holmes also contends that when Martin Plaster, Holmes's accountant, discussed the 1973 financial statement with Hackbart and informed him that he held preferred stock, Hackbart should have asked how his stock differed from Holmes's stock, which was shown on the financial statement as common stock. However, Plaster testified that he did not say anything to Hackbart about the rights attendant to the classes of stock. Because both Holmes and Plaster knew Hackbart was naive about business matters, because preferred stock may either be participating or nonparticipating, and because Holmes knew or should have known that Hackbart believed he was co-owner of the company, we believe that following his discussion with Plaster, Hackbart had no obligation to inquire whether Holmes had indeed changed the terms of the business deal.

also his right to 49% ownership of the corporation.

But the remedy can best be upheld as necessary to avoid unjustly enriching Holmes. Preventing unjust enrichment is a well-recognized exception to the rule limiting damages to the out-of-pocket loss. *See, e.g., Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Nelson v. Serwold*, 576 F.2d 1332, 1338–39 (9th Cir. 1978); *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 801–02 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). Unjust enrichment generally arises when fraud is used to induce another to *sell* securities that, in the buyer's hands, subsequently increase in value; but unjust enrichment can also occur when the innocent party is induced to *purchase* securities. *Zeller*, 476 F.2d at 801–02. Basing damages on Hackbart's expected ownership interest gives him credit for the several years he worked hard as manager of a company that prospered during that time, and is necessary to prevent his co-owner's unjust enrichment. The trial court's award of damages was appropriate.

AFFIRMED.