### In re RIBOZYME PHARMACEU-TICALS, INC. SECURITIES LITIGATION.

### This Document Relates to All Actions.

### Civil Action Nos. 99–B–2235, 99–B–2423, 00–B–02 and 00–B–017.

United States District Court, D. Colorado.

Oct. 24, 2000.

---

See also, 192 F.R.D. 656.

Robert F. Hill, John F. Walsh, III, Hill & Robbins, P.C., Denver, CO, for Plaintiffs.

Frederick J. Bauman, Rothgerber Johnson & Lyons, LLP, Denver, CO, David M. Furbush, Brobeck, Phleger & Harrison, LLP, Palo Alto, CA, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Defendants move pursuant to Rule 12(b)(6) to dismiss Plaintiff's *Consolidated Class Action Complaint* (*Consolidated Complaint*), and for judicial notice of several documents in support of their Rule 12(b)(6) motion. The motions are adequately briefed, and the parties presented oral argument on October 20, 2000. For the reasons set forth below, I grant in part and deny as moot in part Defendants request for judicial notice, and deny the motion to dismiss. Jurisdiction exists under 28 U.S.C. § 1331.

### I.

The material facts, with disputes resolved in Plaintiff's favor, are as follows. This case involves a class action on behalf of all persons who purchased or otherwise acquired the common stock of Defendant Ribozyme Pharmaceuticals, Inc. ("Ribozyme") between the close of trading on November 15, 1999, and the close of trading on November 17, 1999. Defendant Ribozyme is a Delaware corporation with its principal executive offices in Colorado. Defendant Ralph E. Christoffersen resides in Colorado, and has been the Chief Executive Officer, President, and Director of Defendant Ribozyme since 1992.

Defendant Ribozyme is developing a new class of drugs containing ribozymes, a form of ribonucleic acid, to treat or prevent human disease. Defendant Ribozyme is developing one of those drugs, Angiozyme, in collaboration with Chiron Corporation. Angiozyme is designed to inhibit the production of a protein essential to angiogenesis, the process by which new blood vessels are formed. Because cancerous tumors rely on a supply of blood to develop and metastasize, it is hoped that Angiozyme will inhibit the growth of new blood vessels surrounding such tumors, and thereby restrict or halt the development, or spread of certain types of cancer in individuals suffering from the disease.

In its Form 10–K covering the period ending on December 31, 1998 and filed with the Securities and Exchange Commission on May 7, 1999, Defendant Ribozyme summarized the U.S. Government regulations governing the process by which new drugs receive approval by the Food and Drug Administration (FDA):

Before testing of any agents with potential therapeutic value in healthy human test subjects or patients may begin, stringent government requirements for preclinical data must be satisfied. The data, obtained from studies in several animal species, as well as from laboratory studies, are submitted in an IND application or its equivalent in countries outside the United States where clinical studies are to be conducted. The preclinical data must provide an adequate basis for evaluating both the safety and the scientific rationale for the initiation of clinical trials.

Clinical trials are typically conducted in three sequential phases, although these phases may overlap. In Phase I, which frequently begins with initial introduction of the compound into healthy human subjects prior to introduction into patients, the product is tested for safety, adverse effects, dosage, tolerance, absorption, metabolism, excretion and clinical pharmacology. Phase II typically involves studies in a small sample of the intended patient population to assess the efficacy of the compound for a specific indication to determine dose to tolerance and the optimal dose range as well as to gather additional information relating to safety and potential adverse effects.

Phase III trials are undertaken to further evaluate clinical safety and efficacy in an expanded patient population at geographically dispersed study sites to determine the overall risk-benefit ratio of the compound and to provide an adequate basis for product labeling....

Data from preclinical and clinical trials are submitted to the FDA as an NDA for marketing approval and to other health authorities as a marketing authorization application. The process of completing clinical trials for a new drug is likely to take a number of years and requires the expenditure of substantial resources....

*Defendants' Request for Judicial Notice,* Ex. A at 18. As to where in the process Angiozyme stood as of December 31, 1998, Defendant Ribozyme stated that it "ha[d] commenced Phase Ib clinical trials testing safety and tolerability in approximately 16 cancer patients with a broad spectrum of solid tumors and metastasis.... [and] expect[ed] to initiate Phase II clinical trials prior to the end of 1999." *Id.,* Ex. A at 7.

On August 11, 1999, Defendant Ribozyme issued a press release indicating that it had successfully completed the Phase Ia and Ib trials, and that it was "preparing to enter multi-dose Phase I/II clinical trials in Q4 1999." *Id.,* Ex. C at 2. The press release also stated that "studies at several independent centers have demonstrated significant inhibition of both growth and metastases in preclinical trials." *Id.,* Ex. C at 1. Finally, the press release included accounts by Dr. Nassim Usman, Vice President of Research at Defendant Ribozyme and "Angiozyme program director" that Angiozyme "completely inhibited metastases in a clinically relevant colorectal cancer model," and "halt[ed] tumor growth and metastases in a Lewis Lung murine model." *Id.*

On November 15, 1999, Defendant Ribozyme issued a "Media Advisory" entitled "Colorado Pharmaceutical Co. Makes Cancer Drug History" announcing a press conference scheduled for November 17, 1999 (Press Release). The Press Release stated in part

[Defendant Ribozyme] presently has several drug compounds in development, of these Angiozyme—it's cancer drug—has made significant progress. Angiozyme is now in human clinical trials at the Cleveland Clinic Foundation and has taken an important step forward ... making both clinical history and industry news. [At the November 17, 1999 press conference, Defendant] Christoffersen, Ph.D., and other senior RPI staff, will explain Angiozyme and its recent history-making leap, an achievement which may be of great significance to cancer patients everywhere.

*Id.,* Ex. D. On November 16, 1999, the price of a share of stock in Defendant Ribozyme traded on NASDAQ opened at $13.625 after closing on November 15, 1999 at $10.0625. Because the price then rose to $22 within one hour and twenty-five minutes, trading of Defendant Ribozyme's stock was halted. During the halt, Maurice Wolin, vice president of medical affairs for Chiron Corporation (Chiron), stated both that "[w]e don't know if we're going to break ground here or not," and he "doesn't expect any major cancer-drug history to be made since it's too early to say whether the drug works in humans." *Complaint* at para. 38. Later on November 16, 1999, Shari Annes, vice president of corporate communications at Chiron, stated that the Press Release was "very over stated," and "[t]here is always pressure [on small biotechnology companies] when anything good happens, no matter how small, to make it into big news." *Id.*

Also during the halt in trading, Defendant Ribozyme issued a press release indicating that Angiozyme had entered Phase I/II testing as predicted by the May 7, 1999 Form 10–K and the August 11, 1999 press release. After the close of trading on NASDAQ, Defendant Christoffersen stated to reporters that the press release issued earlier in the day had disclosed all of the material information Defendant Ri-

bozyme intended to reveal at the planned November 17, 1999 press conference. At the close of trading on November 16, 17, 1999, the price of Defendant Ribozyme's stock was $12.25 and $9.3125, respectively.

Between November 19, 1999 and January 5, 2000, four separate class action complaints were filed with this court claiming in essence that the information contained in the Press Release was misleading and/or false, and artificially raised the price of Ribozyme shares on November 16, 1999. On January 25, 2000, I consolidated all four cases into this case. On May 30, 2000, the proposed lead plaintiffs filed a *Consolidated Complaint* alleging the following claims for relief: violation of § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder; and violation of § 20(a) of the Exchange Act against Defendant Christoffersen. As support for these claims, Plaintiffs allege in essence both that the November 15, 1999 Press Release misrepresented how far in the FDA approval process Angiozyme had progressed, and the November 16, 1999 Press Release failed to specify that the information contained therein was all that would be discussed at the scheduled November 17, 1999 press conference. On June 29, 2000, Defendants moved to dismiss the entire the *Consolidated Complaint*.

## II.

### A.

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." The complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted); *accord Meade v. Grubbs*, 841 F.2d 1512, 1526 (10th Cir.1988). In reviewing the sufficiency of the complaint, a court must presume that the plaintiff's factual allegations are true and construe them in a light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *accord Meade*, 841 F.2d at 1526. In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with "fact-specific inquir[ies]" such as materiality. *Basic Inc. v. Levinson*, 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir.1997) (quoting *Basic*). Nonetheless, securities claims should be dismissed pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial, or where the complaint fails to satisfy the pleading requirements of 15 U.S.C. § 78u–4(b)(1) & (2). *See Grossman*, 120 F.3d at 1118.

### B.

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5, prescribed by the SEC under Section 78j(b), declares it unlawful for a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (1997). To state a claim under Rule 10b–5, a plaintiff must allege: (1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages. *Grossman*, 120 F.3d at 1118.

The Private Securities Litigation Reform Act of 1995 (Reform Act) amended

the Securities Exchange Act to deter the perceived rise in abusive private securities fraud suits by enhancing the standard for pleading securities fraud claims. Now, to adequately plead a Rule 10b–5 claim, a plaintiff not only must plead with particularity the facts constituting fraud, *see* 15 U.S.C. § 78u–4(b)(1) ("the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"), but also facts permitting a strong inference that the respective defendant acted with the requisite state of mind. *See* 15 U.S.C. § 78u–4(b)(2) ("the complaint shall ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). This is in contrast to the Rule 9(b) standard that allows "[m]alice, intent, knowledge, and other condition of mind of a person [to be] averred generally." Rule 9(b). Consequently, defendants moving to dismiss can now challenge the particularity of allegations regarding both the allegedly false or misleading statements, *and* the alleged state of mind.

### III.

### A.

### i.

Defendants first assert that Plaintiffs have failed to plead adequately that the Press Release was materially false or misleading. They contend that the *Consolidated Complaint* fails to satisfy the pleading requirements of 15 U.S.C. § 78u–4(b)(1). Defendants also assert that Plaintiffs have not established the materiality of any allegedly false or misleading statements insofar as the statements in the Press Release are protected by the "bespeaks caution doctrine" and/or the Reform Act's safe haven for forward-looking statements, and the "truth on the market" doctrine. I will address each argument in turn.

### a.

In the *Consolidated Complaint*, Plaintiffs allege that, as of November 15, 1999, the expected commencement of the Phase II trials of Angiozyme had been announced previously in both the May 7, 1999 Form 10–K, and August 11, 1999 press release. *Consolidated Complaint* at paras. 31–32. Plaintiffs further allege that, in light of this background, they construed the Press Release's announcement of "important corporate and product news" constituting "a history-making leap" as something other than, and perhaps beyond, the previously disclosed commencement of Phase II trials. *Id.* at paras. 5, 36, 42. Finally, Plaintiffs allege that not only the run-up in the stock price, but also the announcements by Mr. Wolin and Ms. Annes, indicate that the interpretation of the Press Release alleged in the *Consolidated Complaint* is reasonable. *Id.* at para. 36, 38. Hence, Plaintiffs conclude in the *Consolidated Complaint* that the Press Release was in fact false and/or misleading because as of November 17, 1999 Angiozyme had only entered Phase II trials. *Id.* at para. 35. Plaintiffs' allegations thus "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). As Judge Brimmer stated in similar circumstances, "[n]either Rule 9(b) nor the Reform Act requires that Plaintiffs do more." *Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.*, 2 F.Supp.2d 1345, 1354 (D.Colo. 1998). Accordingly, I will not dismiss the *Consolidated Complaint* on the basis that it fails to satisfy the pleading requirements of 15 U.S.C. § 78u–4(b)(1).

### b.

The statements in the Press Release are also not immaterial under the "bespeaks caution doctrine" and the Reform Act's safe harbor provision for forward-looking statements, as Defendants contend. Both the "bespeaks caution doctrine" and 15 U.S.C. § 78u–5(c)(1)(A)(i) ap-

ply to forward looking statements. *See Grossman*, 120 F.3d at 1123 ("Grossman correctly observes that the 'bespeaks caution' doctrine only applies to forward-looking statements"); 15 U.S.C. § 78u-5(c)(1)(A)(i) (defendants "shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—(A) the forward-looking statement is—(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"). *See also See Grossman*, 120 F.3d at 1121 ("we hold that the 'bespeaks caution' doctrine, as articulated in this opinion, is a valid defense to a securities fraud claim in the Tenth Circuit"). However, under Plaintiffs' allegations at least part of the Press Release upon which they relied concerned purported historical fact. Indeed, Defendants' statement in the Press Release that "Angiozyme ... has taken an important step forward ... making both clinical history and industry news. [At the November 17, 1999 press conference, Defendant] Christoffersen, Ph.D., and other senior RPI staff, will explain Angiozyme['s][ ] recent history-making leap" was falsifiable at the time it was made.

In arguing that the Press Release contains only forward-looking statements, Defendants focus exclusively on the statement that the alleged "history-making leap ... *may* be of great significance to cancer patients everywhere." (emphasis added). Defendants thus argue in effect that the latter forward-looking clause necessarily renders all other statements in the Press Release forward-looking as well. Nevertheless, it is possible that Angiozyme could have completed a "history-making leap" *within the trials*, but not a sufficiently large leap to warrant the definitive statement that Angiozyme "[*will* ] be of great significance to cancer patients everywhere." Defendants' statements that Angiozyme had made "both clinical history and industry news," and a "history-making leap," are not necessarily forward-looking

given the full context of the Press Release. Under these circumstances, neither the "bespeaks caution" doctrine nor 15 U.S.C. § 78u-5 require dismissal of Plaintiffs' *Consolidated Complaint*.

c.

■ Defendants' argument that the "truth on the market" doctrine renders immaterial any allegedly false or misleading statements in the Press Release is also unpersuasive. The "truth on the market" doctrine excuses "the defendant's failure to disclose material information ... where that information has been made credibly available to the market by other sources." *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1115 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). *See Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir.1996) (identifying this as the "truth on the market" doctrine). No Tenth Circuit panel of which I am aware has addressed the "truth on the market" doctrine.

■ Assuming the Tenth Circuit would adopt the "truth on the market" doctrine, Plaintiffs' claims nevertheless survive dismissal. Construing the alleged facts in the light most favorable to Plaintiffs as I am required to do, the *Consolidated Complaint* alleges that because of the publicly available information regarding Angiozyme, Plaintiffs construed the Press Release's announcement of "important corporate and product news" constituting "a history-making leap" as something other than the previously disclosed commencement of Phase II trials. Consequently, Plaintiffs have alleged that, notwithstanding the cautionary language in the May 17, 1999 Form 10-K filing, they believed based on the Press Release that Defendants would reveal at the November 17, 1999 press conference information not already "on the market." I conclude the "truth on the market" doctrine does not require dismissal of the *Consolidated Complaint*. Plaintiffs have met their burden in pleading that Defendants' statements were materially false or misleading.

### ii.

Defendants next argue that Plaintiffs cannot take advantage of the "fraud on the market" presumption of reliance. Specifically, Defendants claim that Plaintiffs have not plead adequately an efficient market, which is a prerequisite to triggering the presumption. I disagree.

The "fraud on the market" doctrine, endorsed by the Supreme Court in *Basic, see Basic,* 485 U.S. at 241–42, 108 S.Ct. 978, recognizes that in an open, efficient, and developed market, where millions of shares are traded daily, investors must rely on the market to perform a valuation process which incorporates all publicly available information, including misinformation. *See id.* at 241–47, 108 S.Ct. 978. Consequently, the reliance of individual plaintiffs on the integrity of a price in such a market, and implicitly the misinformation that contributed to that price, may be presumed. *See id.* at 247, 108 S.Ct. 978. *See also Grossman,* 120 F.3d at 1118 (recognizing the "fraud on the market" doctrine). In order to take advantage of the doctrine, however, a plaintiff must plead, and ultimately prove, that the market on which the security is traded is efficient. *See Wiles,* 223 F.3d at 1163 n. 2 (recognizing that the "fraud on the market doctrine," and its corresponding presumption of reliance, only apply to efficient markets). *See also Freeman v. Laventhol & Horwath,* 915 F.2d 193, 198 (6th Cir. 1990) (the efficient market requirement is a necessary underpinning of the fraud-on-the-market theory, because "[a]n inefficient market, by definition, does not incorporate into its price all available information about the value of a security."). Courts assessing the efficiency of markets consider: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC Form S–3; and (5) whether there are empirical facts showing a cause and effect relationship between unexpected corporate events or financial

releases and an immediate response in the stock price. *See, e.g., Stat–Tech Liquidating Trust v. Fenster,* 981 F.Supp. 1325, 1345 (D.Colo.1997) (*Stat–Tech* ); *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J.1989). No bright-line rules exist as to how many factors must be plead before a plaintiff is entitled to the presumption of reliance. *See Cammer,* 711 F.Supp. at 1287 ("It is not logical to draw bright line tests . . . to assist fact finders in determining whether a stock trades in an 'open and efficient market.' ").

Here, Plaintiffs assert that the trading volume of Defendant Ribozyme's stock was substantial, *see Consolidated Complaint* at paras. 7, 43(c), and that analysts followed and reported on Defendant Ribozyme. *See id.* at para. 43(d) & (e). In addition, Plaintiffs allege in effect that the Press Release was the sole factor that caused the rise in the stock price from $10.0625 to $22 in less than one and a half hours. The timing of the Press Release and the dramatic increase in the stock price support Plaintiffs' alleged cause and effect relationship. Hence, Plaintiffs allege empirical facts showing a cause and effect relationship between unexpected corporate events and an immediate response in the stock price. Plaintiffs' allegations satisfy, therefore, three of the five *Stat–Tech* factors.

At oral argument, Defendants attempted to counter Plaintiffs' allegations regarding the efficiency of the market on which Defendant Ribozyme's shares are traded by asserting that most if not all of the investors purchasing Defendant Ribozyme's stock on November 16, 1999 were mere "speculators." Defendants cited no authority indicating that such a factor is relevant. In addition, the alleged increase in trading volume of Defendant Ribozyme's stock on November 16, 1999 suggests that the investors therein were not all speculators. In any event, the question is not whether these referenced investors acted with the level of caution Defendants would have liked. The question is whether

Plaintiffs have alleged facts supporting the inference that the market on which Defendant Ribozyme's shares are traded is efficient. Because Plaintiffs' allegations satisfy three of the five *Stat–Tech* factors, I conclude that Plaintiffs have done just that. Accordingly, Plaintiffs are entitled to the presumption of reliance.

iii.

Defendants contend that the Section 10(b) claim must be dismissed because Plaintiffs have failed to plead with particularity Defendants' connection to the Press Release. In support of this argument, Defendants cite my decision in *In re Storage Technology Corporation Securities Litigation*, 804 F.Supp. 1368 (D.Colo.1992) (*Storage Technology*) in which I declined to adopt an exception for "group-published documents" to the rule that fraud must be pled with particularity. *Storage Technology* 804 F.Supp. at 1372 (noting that the Ninth Circuit in *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987) adopted the exception). Under the "group published documents" exception, "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents . . . which presumably involve collective actions of corporate directors or officers." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir.1997). I declined to apply the "group-published documents" exception in *Storage Technology* because, although the Tenth Circuit at that time had never explicitly addressed the exception, I believed it ran contrary to the general approach of the Tenth Circuit to pleading in securities fraud cases.

In their response, Plaintiffs cite *Schaffer v. Evolving Sys., Inc.*, 29 F.Supp.2d 1213, 1225 (D.Colo.1998) which correctly states that in *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir.1997) the Tenth Circuit adopted the "group-published documents" exception subsequent to my decision in *Storage Tech. See Schaffer v. Evolving Sys., Inc.*, 29 F.Supp.2d 1213, 1225 (D.Colo.1998) (citing *Schwartz* for the

"group-published documents" exception). *See also Schwartz*, 124 F.3d at 1254 (holding that "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."). It is not clear why Plaintiffs did not cite directly to *Schwartz*—the one decision that binds me. Nevertheless, Plaintiffs allege in their *Consolidated Complaint* that Defendant Christoffersen "has been the Chief Executive Officer, President, and Director of Defendant Ribozyme since 1992." *Consolidated Complaint* at para. 16.

██ Confronted however indirectly with *Schwartz*, Defendants in their reply implicitly concede that *Schwartz* adopted the exception for "group-published documents" but contend that the exception does not encompass press releases. *Defendants' Reply* at 13–14. According to Defendants, press releases "cannot by any stretch of the imagination 'presumably involve collective actions of corporate directors of officers.'" *Id.* at 14 (quoting *Schwartz*, 124 F.3d at 1254). Defendants overlook the *Schwartz* court's favorable citation to *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987) for the proposition that "prospectuses, registration statements, annual reports, *press releases*, or other 'group published information' are presumed collective actions." *Schwartz*, 124 F.3d at 1254 (emphasis added). Defendants should have brought the *Schwartz* court's citation to *Wool* to my attention in their reply as their duty of candor requires them to do.

When the *Schwartz* court's citation to *Wool* was brought to Defendants' attention at oral argument, Defendants argued that they issued a "Media Advisory" on November 15, 1999, and not a press release. Defendants were nevertheless unable to articulate any comprehensible difference between a "media advisory" and a press release. Because this argument is untena-

ble, I will not address it further. Under these circumstances, and based on the foregoing Tenth Circuit authority, I conclude that the "group-published documents" exception applies to press releases. Because Plaintiffs have alleged that Defendant Christoffersen is a "corporate director[ ] or officer[ ]," *Schwartz,* 124 F.3d at 1254, they are entitled to the presumption of the "group-published documents" exception.

■ Even if the "group-published documents" exception did not apply to press releases, I would not dismiss Plaintiffs' Section 10(b) claim. According to Plaintiffs' allegations, the Press Release specifically mentioned that Defendant Christoffersen "[would] explain Angiozyme and its recent history-making leap" at the November 17, 1999 press conference. *Consolidated Complaint* at para. 2. Given this alleged direct reference to Defendant Christoffersen, Plaintiffs have presented sufficient allegations regarding the connection of Defendant Christoffersen, and thus Defendant Ribozyme, to the Press Release. Accordingly, I will not dismiss Plaintiffs' Section 10(b) claim because it fails to plead with particularity Defendants' connection to the Press Release.

### iv.

Defendants next contend that the *Consolidated Complaint* must be dismissed because Plaintiffs have not pled with particularity facts giving rise to a strong inference of scienter. I again disagree.

■ The Reform Act requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Because I held above that the statements challenged by Plaintiffs are not necessarily forward-looking, Plaintiffs need only plead facts giving rise to a strong inference that Defendants acted with conscious recklessness. *See O'Connor v. R.F. Lafferty & Co.,* 965 F.2d 893, 899 (10th Cir.1992); *Queen Uno,* 2 F.Supp.2d at 1356. The Tenth Circuit has defined this type of

reckless behavior as conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *O'Connor,* 965 F.2d at 899 (quoting *Hackbart v. Holmes,* 675 F.2d 1114, 1118 (10th Cir.1982)). *See Anixter v. Home–Stake Production Co.,* 77 F.3d 1215, 1233 (10th Cir.1996) ("This circuit still maintains that recklessness as defined in *Hackbart* is sufficient scienter for finding civil § 10(b) primary violations.").

Here, viewing the alleged facts in the light most favorable to Plaintiffs, the *Consolidated Complaint* alleges that Ms. Annes of Chiron stated that Defendants issued a "very overstated" Press Release because of the "[constant] pressure [on small biotechnology companies such as Defendant Ribozyme] when anything good happens, no matter how small, to make it into big news." *Consolidated Complaint* at para. 38. Plaintiffs also allege that Mr. Wolin stated both "[w]e don't know if we're going to break ground here or not," and he "doesn't expect any major cancer-drug history to be made since it's too early to say whether the drug works in humans." *Id.* Finally, Plaintiffs allege that Chiron was Defendant Ribozyme's own partner in the development of Angiozyme. The strong inference derived from these allegations is stated explicitly by Plaintiffs elsewhere: Defendant Christoffersen, and thus Defendant Ribozyme, "knew that . . . the positive statements made by and about Ribozyme and its products [in the Press Release were] materially false and misleading." *Id.* at para. 20. Under these circumstances, Plaintiffs have satisfied the pleading requirements of 15 U.S.C. § 78u–4(b)(2).

### v.

Defendants finally argue that Plaintiffs' Section 20(a) claim must be dismissed because they have failed both to allege a primary securities violation, and plead with particularity the connection between De-

fendant Christoffersen and the allegedly fraudulent statements. Yet again, I disagree.

■ Under Section § 20(a), a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator. *See* 15 U.S.C. § 78t(a). The Tenth Circuit has held that to state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person. *See First Interstate Bank v. Pring,* 969 F.2d 891, 897 (10th Cir.1992), *rev'd on other grounds sub nom. Central Bank v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119, (1994). The Tenth Circuit "has expressly 'reject[ed] those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.'" *See Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1305 (10th Cir.1998) (quoting *First Interstate Bank,* 969 F.2d at 897). Rather, because " '[t]he statute is remedial and [thus] construed liberally,' " the Tenth Circuit " 'requir[es] only some indirect means of discipline or influence short 'of actual direction to hold a 'controlling person' liable.' " *Maher,* 144 F.3d at 1305 (quoting *Richardson v. MacArthur,* 451 F.2d 35, 41–42 (10th Cir.1971)). *See First Interstate Bank,* 969 F.2d at 898 ("the language of the statute leads us to join those circuits that hold that a plaintiff need not prove that the defendant actually or culpably participated in the primary violation."). Further, because "the control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss, dismissal is appropriate when ... a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Maher,* 144 F.3d at 1305.

■ Here, because I have not dismissed Plaintiffs' Section 10(b) claim, I cannot dismiss their Section 20(a) claim on the basis that there is no primary violation

of the securities laws. In addition, because Plaintiffs have pled that Defendant Christoffersen has been the "Chief Executive Officer, President, and Director of Ribozyme since 1992," they have sufficiently pled that he had "some indirect means of discipline or influence short of actual direction" with respect to the Press Release and the November 16, 1999 press release. *Richardson v. MacArthur,* 451 F.2d 35, 41–42 (10th Cir.1971). *See Maher,* 144 F.3d at 1305. In any event, Plaintiffs have pled "facts from which it can reasonably be inferred [Defendant Christoffersen] was a control person." *Maher,* 144 F.3d at 1305.

Even if Plaintiffs failed to plead "facts from which it can reasonably be inferred [Defendant Christoffersen] was a control person [generally]," *Maher,* 144 F.3d at 1305, I would not dismiss the *Consolidated Complaint.* According to Plaintiffs' allegations, the Press Release specifically mentioned that Defendant Christoffersen "[would] explain Angiozyme and its recent history-making leap" at the November 17, 1999 press conference. *Consolidated Complaint* at para. 2. Given this alleged direct reference to Defendant Christoffersen, Plaintiffs have alleged sufficient facts from which it can reasonably be inferred that Defendant Christoffersen "actually or culpably participated in the primary violation." *Maher,* 144 F.3d at 1305. I will not dismiss Plaintiffs' Section 20(a) claim.

### B.

Defendants also move for judicial notice of several documents in support of their Rule 12(b)(6) motion. Plaintiffs only oppose judicial notice of Exhibits B, F. Because I have not relied on Exhibits B, F in considering Defendants' motion to dismiss, I grant Defendants' request with respect to Exhibits A, C, D, E, G, and H, and deny it as moot with respect to Exhibits B, and F.

Accordingly, IT IS ORDERED that

(1) Defendants' motion to dismiss is DENIED; and

(2) Defendants' request for judicial notice is GRANTED IN PART with respect to Exhibits A, C, D, E, G, and H, and DENIED AS MOOT IN PART with respect to Exhibits B, and F.